# Illinois Official Reports

## Appellate Court

*C.O.A.L., Inc. v. Dana Hotel, LLC*, 2017 IL App (1st) 161048

| | |
|---|---|
| Appellate Court Caption | C.O.A.L., INC., Plaintiff-Appellant, v. DANA HOTEL, LLC, Defendant-Appellee. |
| District & No. | First District, Fifth Division<br>Docket No. 1-16-1048 |
| Filed | August 4, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-L-7217; the Hon. Eileen O'Neill Burke, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Lema A. Khorshid and John M. Kraft, of Fuksa Khorshid, LLC, of Chicago, for appellant.<br><br>Richard F. Linden, of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Hall and Lampkin concurred in the judgment and opinion. |

**OPINION**

¶ 1     The instant appeal arises from the trial court's section 2-615 dismissal of the complaint filed by plaintiff C.O.A.L., Inc., regarding the termination of the restaurant manager-owner relationship between plaintiff and defendant Dana Hotel, LLC. The trial court dismissed count I of plaintiff's complaint because it found that the agreement relied on by plaintiff had been superseded by a later agreement and dismissed count III because it found that plaintiff's claims that defendant had breached its fiduciary duty had been released. Plaintiff appeals the dismissal of both counts and, for the reasons that follow, we reverse.

¶ 2                                    BACKGROUND
¶ 3                             I. Complaint and Exhibits
¶ 4                                   A. Complaint

¶ 5     Plaintiff filed a complaint against defendant on June 21, 2013; the complaint was amended twice, and it is the dismissal of the second amended complaint that is at issue on appeal.

¶ 6     The complaint alleges that plaintiff is an Illinois corporation engaged in the restaurant management business, and defendant is an Illinois limited liability company that operates the Dana Hotel Chicago, a hotel located in Chicago. Together, plaintiff and defendant are the two members of Argent Restaurant, LLC, an Illinois limited liability company formed to operate the Argent restaurant at the hotel.

¶ 7     On October 19, 2011, plaintiff and defendant entered into a restaurant management agreement (management agreement), a written contract for restaurant management services for the restaurant. This management agreement was a five-year contract, with an effective date of May 1, 2012, and a three-year optional renewal period. Under the terms of the management agreement, plaintiff was to provide restaurant management services for the restaurant in exchange for (1) a $100,000 annual management fee, payable in monthly increments from the first date the restaurant was open and operating, (2) repayment of plaintiff's $154,000 capital investment, to be paid from the restaurant's profits, and (3) 50% of adjusted net operating income from the restaurant, over and above the amounts needed to repay the parties' invested capital in the project and the funding of an operating reserve fund. Plaintiff's duties in managing the restaurant included (1) the hiring and management of employees, including a chef and general manager, (2) overseeing and ensuring the operation of an orderly, high-quality restaurant in accordance with industry standards, (3) provision of an annual projected budget for the restaurant and operation within the approved budget, (4) provision to defendant of marketing concepts for the restaurant and performance of public relations duties, (5) recordkeeping of revenues and expenses, (6) creation of the restaurant's menu, (7) compliance with all laws pertaining to the operation of the restaurant, and (8) timely submission of invoices for goods and services contracted by plaintiff in connection with the management and operation of the restaurant, to be paid by defendant. The complaint alleges that plaintiff complied with its duties under the management agreement.

¶ 8     Shortly after entering into the management agreement, the parties agreed to form Argent Restaurant, LLC (LLC), which was formed on April 4, 2012, with plaintiff and defendant as equal members. The parties agreed that plaintiff's duties to the LLC would mirror its duties as described in the management agreement, while defendant would handle the general accounting

for the restaurant and provide plaintiff with weekly profit and loss statements based on the records gathered in defendant's point-of-sale (POS) systems.[1] The parties also agreed that defendant would establish a bank account or accounts in the name of the LLC so that its accounts could be maintained separately from those of the hotel.

¶ 9    The complaint alleges that plaintiff made repeated demands for the account information for the LLC's account and was repeatedly denied access to that information by defendant and further alleges that defendant never established a separate account for the LLC or the restaurant and instead commingled funds derived from the restaurant with the hotel's accounts. The complaint alleges that the POS system for the restaurant was part of the same system that defendant used in its other hotel operations, so all data from the restaurant POS went directly to defendant, who was supposed to process the information and provide it in weekly profit and loss statements to plaintiff so that plaintiff could comply with its duties to create an accurate restaurant budget and keep records of the restaurant's revenues and expenses.

¶ 10    The complaint alleges that plaintiff began noticing mistakes on each of the weekly profit and loss statements provided by defendant and repeatedly pointed out these mistakes to defendant. Defendant consistently ignored the mistakes and eventually began certifying the restaurant's records for purposes of business accounting without seeking or obtaining plaintiff's approval. Plaintiff was also denied access to the restaurant's books and records and accounting information.

¶ 11    According to the complaint, the "mistake-laden" profit and loss statements that were produced between April and December 2012 showed that the restaurant was suffering consistent losses. When plaintiff made demands for its management fee, defendant informed plaintiff that it could not pay the management fee while the restaurant continued to lose money. The complaint alleges that the refusal to pay the management fee constituted a breach of the management agreement, which did not condition payment of the management fee on the restaurant's profits or losses.

¶ 12    The complaint alleges that in December 2012, the parties began discussing the possibility of a negotiated buyout by defendant of plaintiff's interest in the LLC, as well as a negotiated termination of the management agreement. "After much negotiation, Plaintiff and Defendant agreed in principle to a so-called 'Separation Agreement' *** by which Defendant would take sole ownership of [the LLC], and Plaintiff would cease to be the Restaurant's Manager under the [management agreement], in exchange for payment of certain amounts to Plaintiff." The complaint alleges that plaintiff's principals executed a copy of the separation agreement on March 25, 2013, "on the understanding that certain conditions in the [separation agreement] would be met by the Defendant before it became effective," including (1) defendant's provision of profit and loss documentation and other records sufficient to verify and agree upon the total capital invested by the parties in the restaurant (the necessary records), (2) plaintiff's provision of its total capital figure to be used in calculating the total purchase price under the separation agreement, which would be based in significant part on the records provided by defendant, (3) negotiation for settlement of all outstanding invoices by plaintiff, to

---

[1]"An electronic POS system streamlines retail operations by automating the transaction process and tracking important sales data. A basic system includes an electronic cash register and software to coordinate data collected from daily purchases." *Point of Sale—POS*, Investopedia, http://www.investopedia.com/terms/p/point-of-sale.asp (last visited June 21, 2017).

be paid by defendant, and (4) transfer of all operations from plaintiff to defendant by April 30, 2013. The formula for establishing what plaintiff would be paid for a buyout of its interest in the LLC and the cessation of restaurant operations was outlined in the separation agreement and relied on accounting records to be provided by defendant, which plaintiff had not yet received at the time of execution of the separation agreement.

¶ 13    The complaint alleges that, prior to April 2, 2013, and during the pendency of the separation agreement negotiations, Sean Mulroney, on behalf of plaintiff, met with Gene Kornota, on behalf of defendant, to discuss the separation agreement negotiations. During this meeting, they discussed the terms of the separation agreement, and Mulroney indicated that without the necessary documents, the parties would be unable to fix a price or carry out the terms of the separation agreement. Kornota could not provide a timeline for when the necessary records would be provided "and ultimately ended the conversation with a statement that no matter what happened, he and his partners would 'never pay [Plaintiff] a dime.' "

¶ 14    The complaint alleges that on March 27, 2013, plaintiff sent defendant an e-mail renewing its request for access to the LLC's books and records. According to the separation agreement, the parties were to agree on a "Total Capital Invested" figure by March 28, 2013, which was to be calculated after defendant's provision of the necessary records, but plaintiff was unable to verify or agree to the figure by that date because it had not been provided any of the necessary records.

¶ 15    The complaint alleges that on April 2, 2013, defendant notified plaintiff that it was being locked out of operations as the restaurant's manager and advised plaintiff and the restaurant's staff members that they were no longer allowed to come onto the premises of the hotel or to perform duties under the management agreement. Since that day, plaintiff has been unable to enter the hotel's premises or to perform its duties under the management agreement. On the same day as it locked plaintiff out, defendant provided plaintiff with an executed version of the separation agreement, signed by its principals, "claiming that the signed [separation agreement] provided a valid and enforceable basis for terminating Plaintiff's rights under the [management agreement]."

¶ 16    The complaint contains three counts. Count I is for breach of the management agreement and alleges that, at all times, the management agreement was a binding and enforceable contract, requiring plaintiff to perform the duties described in the management agreement in exchange for the payments described therein. Count I alleges that, "[a]t all times before April 2, 2013, Plaintiff performed its duties under the terms of the [management agreement]." Count I further alleges that defendant's act of locking plaintiff out from the hotel and denying plaintiff the ability to perform its duties under the management agreement constitutes a breach of the management agreement. Count I also alleges that despite plaintiff's performance of its duties, defendant never paid plaintiff its management fee of $100,000 per year and plaintiff was also never compensated for any portion of its initial capital contribution. Count I also alleges that defendant's *de facto* termination of the management agreement on April 2, 2013, was without cause and that the management agreement specifies that plaintiff is entitled to certain sums of money that plaintiff had not received.

¶ 17    With respect to the separation agreement, count I alleges that "[o]n April 1, 2013, before any of the conditions necessary to effect and validate the [separation agreement] had been met by Defendant, and before Defendant's unilateral termination of the [management agreement], Plaintiff notified Defendant that it was cancelling the [separation agreement], and that it

- 4 -

intended to continue performing under the [management agreement's] terms." Count I further alleges that "[t]he [separation agreement] was an executory agreement, subject to several conditions of performance by Defendant that were not met" and that "Plaintiff's resignation as manager of the Restaurant was only to be effective under the [separation agreement] at an unspecified future date, when all of the [separation agreement's] conditions had been met." Count I alleges that "[b]ecause the [separation agreement's] conditions were not met prior to Plaintiff's termination of the [separation agreement] on April 1, 2013, the [separation agreement] has no legal effect, and does not serve to invalidate the terms of the [management agreement]." Count I alleges that based on defendant's failure to pay the management fee and other amounts due under the management agreement, plaintiff had sustained damages.

¶ 18 Count II is pleaded in the alternative and alleges a breach of the separation agreement. Count II is not at issue on appeal.

¶ 19 Count III was for breach of fiduciary duty and alleged that as comembers of the LLC, plaintiff and defendant had fiduciary duties toward each other, "including the duties of loyalty, care, and good faith and fair dealing and, specifically the duty of disclosure of necessary information to members." Count III alleges that based on defendant's conduct in refusing to allow plaintiff access to information, commingling accounts, and refusing to correct its mistakes, defendant breached its fiduciary duties of loyalty, care, and good faith and fair dealing toward plaintiff. Count III further alleges that, on information and belief, defendant maintained two sets of accounting books, one of which reflected accurate information and one of which contained purposefully modified information that was shared with defendant's investors, and that defendant used funds belonging to the LLC to pay debts owed by defendant. Count III alleges that plaintiff was damaged by defendant's breaches in that it was deprived of the opportunity to realize profits from the restaurant's operations, including payment of its management fees, repayment of its capital contribution, and the ability to realize profits.

¶ 20                                         B. Management Agreement

¶ 21 Attached to the complaint was a copy of the management agreement, which was dated October 19, 2011, and provided that plaintiff would be retained to manage the restaurant on defendant's premises and to provide public relations for the restaurant. The initial term of the management agreement was for five years, with an option to renew for an additional three years. Section 3 of the management agreement provided that "[plaintiff] shall receive a management fee (the 'Base Management Fee') equal to $100,000.00 per fiscal year as a base Management Fee from the operations of [the restaurant], payable in advance on the first day of each month beginning on the first full month after the Launch of [the restaurant], during the Term, plus an incentive fee" as further described by the management agreement, which included 50% of the adjusted net operating income.

¶ 22 Section 9 of the management agreement set forth the duties and responsibilities of plaintiff as the manager. Section 9 provided that plaintiff would submit a proposed annual budget to defendant, which defendant would approve at its discretion. Section 9 further provided that plaintiff "shall maintain or compile and shall provide [defendant] with any and all other information, accounts, reports or records related to the Restaurant as the [defendant] may reasonably require" and "shall submit all invoices properly coded to [defendant] at the end of every week." Section 9 provided that defendant "shall cooperate with [plaintiff] with respect to the items set forth in this Section ***. To the extent [defendant] fails to timely provide any

information needed to prepare such reports (for example, invoices received directly by [defendant]), [plaintiff] shall not be required to perform."

¶ 23    Section 14 of the management agreement pertained to default and termination by defendant and provided that "[i]t shall be an event of default hereunder *** if any one or more of the following events shall occur," followed by a list of three events of default: (1) "[t]he failure of [plaintiff] to perform, keep or fulfill any of its covenants, undertakings or obligations set forth in this Agreement" if the failure was not cured within the time provided by the management agreement; (2) "[plaintiff's] (including its officers', directors', members', partners' or shareholders') dishonesty, breach of fiduciary duty, breach of duty of loyalty or breach of duty to act in good faith, as determined by [defendant]"; and (3) plaintiff's filing of a bankruptcy petition. Section 14 provided that "[t]his Agreement and the Term hereof shall terminate upon the occurrence of an Event of Default. [Defendant] must give [plaintiff] notice of such default in writing and [plaintiff] shall have 30 days from receipt of notice to cure." Section 14 further provided that, if defendant elected to terminate the management agreement without cause, "[defendant] shall pay [plaintiff] 50% of the Base Management Fee for the remainder of the initial term of the Agreement."

¶ 24                              C. Separation Agreement

¶ 25    Also attached to the complaint was a copy of the separation agreement, which provided that it "is made effective as of this 25th day of March, 2013," and was executed by Sean Mulroney and Julie Darling on behalf of plaintiff and by Gene Kornota and Anthony Klok on behalf of defendant; the signature lines do not have dates written next to the signatures. The recitals of the separation agreement provided:

"WHEREAS, [plaintiff] and [defendant] entered into a Restaurant Management Agreement *** on October 19, 2011 for the redesign and management of the restaurant located in the Dana Hotel;

WHEREAS, [plaintiff] and [defendant] are Members and Managers of Argent Restaurant LLC, each party with a 50% interest;

WHEREAS, [plaintiff] has acted in the capacity of Manager of the restaurant, Argent Restaurant and Raw Bar *** since May 1, 2012;

WHEREAS, [plaintiff] desires to resign as Manager and Member of Argent [R]estaurant LLC and as manager of the Restaurant;

WHEREAS, [plaintiff] also desires [that defendant] redeem all of the Interest in Argent Restaurant LLC held by [plaintiff], constituting a 50% Interest in Argent Restaurant LLC;

WHEREAS, [defendant] desires to accept such resignations; and

WHEREAS, [defendant] is willing to redeem [plaintiff's] Interest, as partial consideration for the releases and agreements set forth herein.

NOW, THEREFORE, in consideration of the foregoing promises, which are hereby incorporated into the terms of this Agreement, and in exchange for the mutual promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows[.]"

¶ 26    Section 2.2 of the separation agreement was entitled "Purchase Price; Payment and Transfer," and provided in paragraph 2.2(a) that "[i]n consideration of the sale to [defendant]

by [plaintiff] of the Redeemed Interest and the other terms and conditions hereof, including the release and restrictive covenants, [defendant shall] deliver to [plaintiff] a separation fee as calculated by the formula set below (hereinafter the 'Purchase Price')," consisting of:

> "Total Capital Invested to date $230,755.17. This total to be verified and agreed to by the parties by March 28, 2013.
>
> Less Capital Expenditure by [defendant] $77,500.00
>
> Plus [plaintiff's] Management Fee at time of separation
>
> Less Cash Flow Shortfall Obligation of [plaintiff] at time of separation
>
> Less all outstanding invoices and obligations for pre-opening expenses to be paid as set forth in Paragraph 2.2(c) below."

Paragraph 2.2(a) further provided that "Capital Shortfall or surplus through February 2013 shall be reviewed and commented on no later than 5 days after the receipt by [plaintiff] of all documentation and accounting for Capital Shortfall or surplus. Capital Shortfall from March 1 thru the Date of Separation shall be agreed to by the Parties to the best of [plaintiff's] and [defendant's] abilities at the time of separation (but no later than April 20, 2013) and shall be considered final." Paragraph 2.2(a) also provided:

> "The Purchase Price from the above calculation shall be paid to [plaintiff] upon transfer of all operations to [defendant] and after the payment of all outstanding invoices and obligations are made as directed by [plaintiff], or as otherwise provided for in paragraph 2.2(c), verified and paid by [defendant] and not before the receipt of all executed final waivers of lien from all such vendors, contractors and consultants are received, and lawsuits (other than *Motamen et al. v. Mulraney et al.* No. 13 CH 02204) settled and withdrawn. In the event that [plaintiff] cannot reach an agreement with either Simon Sez or Albazi Architects before the separation, [defendant] shall hold back amounts sufficient to cover the invoices in full until such time as these invoices can be successfully resolved, but no later than May 30, 2013, after this time [defendant] shall use its best efforts to settle the claim, but not greater than the amount listed in Exhibit A, attached hereto."

¶ 27    Paragraph 2.2(c) provided that "[plaintiff] shall have the ability and the authority to negotiate all outstanding invoices due from Capital Improvement and any other outstanding invoices to an amount less than that demanded with the one exception of Stuever & Sons. Any savings on outstanding invoices due shall inure to the benefit of [plaintiff] in the calculation set forth in 2(a) above. [Plaintiff] shall receive releases from all such outstanding invoices due but no later than fifteen days prior to separation. [Defendant] will then have a period of 15 days to validate the waivers of lien and amounts due. In the event [plaintiff] has not produced or arranged for such waivers by April 7, 2013 [defendant] may elect to pay any such obligations and deduce the amount from [plaintiff's] Capital account for all invoices other than those specifically referenced in paragraph 2(a) above."

¶ 28    Article 3 was entitled "Resignation and Release" and provided, in full:

> "3.1 *Resignation.* [Plaintiff] hereby resigns from its positions as a manager, director or officer of the Argent Restaurant LLC, effective upon Separation of this Agreement.
>
> 3.2 *Claims, Demands and Causes of Action.* As used in this Agreement, 'claims,' 'demands,' and 'causes of action' include, but are not limited to, claims based on

contract, whether express or implied, fraud, stock fraud, defamation, wrongful termination, estoppel, equity, tort, retaliation, intellectual property, personal injury, spoliation of evidence, emotional distress, public policy, wage and hour law, statute or common law, claims for severance pay, claims related to stock options and/or fringe benefits, claims for attorneys' fees, vacation pay, debts, accounts, compensatory damages, punitive or exemplary damages, liquidated damages, and any and all claims arising under any federal, state, or local statute, law or ordinance prohibiting discrimination on account of race, color, sex, age, religion, sexual orientation, disability or national origin, including but not limited to, the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964 as amended, the Americans with Disabilities Act, the Family and Medical Leave Act, the Employee Retirement Income Security Act[,] the Illinois Human Rights Act[,] and claims for compensatory damages, punitive damages, and/or liquidated damages."

¶ 29　　Article 4 concerned plaintiff's representations and warranties and provided, in relevant part, that plaintiff represented and warranted to defendant that:

"[Plaintiff] is a corporation duly organized, existing, and in good standing under the laws of the State of Illinois, and its principals Julie Darling and Sean Mulroney have full power, right and authority to execute, deliver and perform this Agreement and to perform the transactions contemplated hereby. This Agreement when executed by [plaintiff], Julie Darling and Sean Mulroney, will have been fully and validly executed and delivered by them and will constitute legal, valid and binding obligations of [plaintiff], enforceable in accordance with its terms. The execution of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary parties on behalf of [plaintiff]. The execution, delivery and performance by [plaintiff] of this Agreement will not constitute or result in a breach or default under, or conflict with, any order, ruling or regulation of any court, tribunal or government agency, or any agreement or undertaking to which [plaintiff] is a party of by which [plaintiff] is bound. The signatures on this Agreement are genuine and the signatory has legal competence and authority to execute the same."

¶ 30　　Similarly, article 5 contained defendant's representations and warranties and provided:

"[Defendant] is a limited liability company duly organized, existing and in good standing under the laws of the state of Illinois. [Defendant] has full power, right and authority to execute, deliver and perform this Agreement and to perform the transactions contemplated hereby. This Agreement when executed by [defendant] will have been fully and validly executed and delivered by [defendant] and will constitute legal, valid and binding obligations of [defendant], enforceable in accordance with its terms. The execution of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on behalf of [defendant]. The execution, delivery and performance by [defendant] of this Agreement will not constitute a breach or default under, or conflict with any order, ruling or regulation of any court, tribunal or governmental agency, or any agreement or other undertaking, to which [defendant] is a party or by which [defendant] is bound. The signatures on this Agreement are genuine and the signatory has legal competence and authority to execute the same."

¶ 31    Article 9 contained miscellaneous provisions, including section 9.7, which was entitled "Captions" and provided that "[t]he Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof." Additionally, section 9.9 was entitled "Entire Agreement; Assignment" and provided:

> "This Agreement (including any scheduled, exhibits or annexes hereto) (i) constitutes the entire agreement, and supersedes all other prior agreements, understandings, representations, and warranties, both written and oral, among the parties with respect to the subject matter hereof; and (ii) shall not be assignable by operation of law or otherwise and is not intended to create any obligations to, or rights in respect of, any persons other than the parties hereto. Notwithstanding the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted heirs, successors and assigns."

¶ 32                                   D. E-mails

¶ 33    Also attached to the complaint were two e-mails. The first was dated March 27, 2013, and was sent by Sean Mulroney; the e-mail does not state who it was sent to, but the complaint alleges that it was sent by Mulroney to Gene Kornota. The e-mail provides:

> "In response to your text of yesterday I should point out that I have not requested any documents that we are not permitted to see by law pursuant to the Illinois Limited Liability Company Act. This is essentially a winding up of our partnership and a review of the full year of accounting should be welcomed by both parties. We never certified October and in our review of December we identified several overcharges to Argent that occurred in every prior month. We have not been provided any information to show whether or not our credits were correctly applied. Therefore, we require the documentation I requested to close out the year.

> Regarding the anxiety of the restaurant staff, it is driven by comments made by 2 of vertigo's door staff to one of our managers as well as Lisa O'Leary's discussion with the kitchen. I am only suggesting that it will best serve all of us to make an announcement as soon as possible in order to have a smooth transition. Despite the fact that this relationship did not work out, we still have a sense of pride for the product we deliver and in the staff that works for us.

> It would be expedient to begin our review immediately. Enjoy your vacation with your family."

¶ 34    The second e-mail was dated April 1, 2013, and was sent by Mulroney; again, the e-mail does not state who it was sent to, but the complaint alleges that it was sent by Mulroney to Tony Klok. The e-mail provides:

> "I have provided the list of documents we need to review. In an effort to complete this review quickly and in the spirit of our negotiated agreement we have retained an accountant [to] review those documents.

> I am also concerned about the Agreement. Since both you and Gene have not been available for the last week or so, the deadlines set forth in the Agreement are no longer feasible. Understand that this Agreement is supposed to be a way for both parties to separate amicably.

In holding to the terms of the Restaurant Management Agreement, in order for you not to renew that Agreement pursuant to Paragraph 2, you were required to provide notice of non-renewal to us no later than 120 days prior to the expiration of the term in the manner set forth in paragraph 22. That you did not do. Arguably we now have an additional 5 year term. Additionally, you owe [plaintiff] the $100K Management fee as set forth in Paragraph 3. Any Capital Shortfall can only be addressed according to the terms and procedures as set forth in Paragraph 5, addressing Additional Contributions. You have also not complied with these provisions. Therefore, we can assert our continuing management status and demand payment or we can settle this in the manner first proposed by Gene.

What would you like to do?"

## II. Motion to Dismiss

¶ 36 On October 14, 2014, defendant filed a motion to dismiss counts I and III of the second amended complaint pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2012)). With respect to count I, defendant argued that plaintiff could not sue under the management agreement because the management agreement had been superseded by the separation agreement pursuant to the merger clause in section 9.9 of the separation agreement. Defendant argued that the separation agreement became effective on March 25, 2013, and that only plaintiff's signature was needed in order for the separation agreement to be binding. Defendant further argued that its furnishing of financial data was not a condition precedent to either the formation of or plaintiff's performance under the separation agreement.

¶ 37 Defendant also argued that count III of the second amended complaint should be dismissed because plaintiff had failed to plead sufficient facts to state a claim for breach of fiduciary duty. Defendant further argued that count III should be dismissed because plaintiff had released such a claim under the separation agreement.

¶ 38 In response, plaintiff claimed that the separation agreement was ineffective because defendant had not signed it and defendant had not performed the conditions precedent to the contract's formation. Plaintiff also argued that defendant had repudiated the separation agreement when Kornota informed Mulroney that defendant would never pay plaintiff and when defendant locked plaintiff out of the restaurant. Plaintiff further argued that its claims for breach of fiduciary duty had not been released because the separation agreement was not a general release and did not specifically mention claims for breach of fiduciary duty.

## III. Trial Court Ruling

¶ 40 On January 15, 2015, the trial court granted defendant's motion to dismiss counts I and III of the second amended complaint with prejudice. The court found:

"The [separation agreement] provides it was 'made effective as of [the] 25th day of March, 2013.' [Citation.] Thus, the [separation agreement] appears effective based upon the established date, along with [plaintiff's] providing the Court with a fully executed copy of the same; the execution of which related back to the prior established effective date. The [separation agreement] expressly provides that it 'supersedes all other prior agreements, understanding[s], representations, and warranties, both written

and oral, among the parties with respect to the subject matter [therein].' [Citation.] Further, the parties acknowledged the receipt of 'good and valuable consideration' in consideration for the mutual promises contained within the [separation agreement], at the time of its effectiveness. [Citation.] Thus, per the language of the [separation agreement] itself, it would appear that both [plaintiff] and [defendant] were bound to its terms. With respect to the alleged conditions precedent, which seem to form the substance of Section 2.2 of the [separation agreement], [section 2.2] appears as obligations to be performed by [defendant] beyond the execution and effective date of the [separation agreement] itself. In other words, such conditions were not precedential to the effectiveness of the [separation agreement], but obligations to be performed by [defendant] arising out of its entering into the [separation agreement] itself. [Citation.] Whereas [plaintiff] seeks determination of its purported cancellation of the [separation agreement] on [defendant's] alleged repudiation, for the purpose of reviving the [management agreement], it would appear impossible as the [separation agreement] expressly replaced the [management agreement], and [defendant's] actions thereunder may constitute breach under the [separation agreement], as opposed to repudiation given the [separation agreement's] effectiveness. Thus, as it appears the [separation agreement] became effective by March 25, 2013, such constitutes the termination of the [management agreement], and [plaintiff's] waiver of [defendant's] alleged breach thereunder."

¶ 41 With respect to the claim of breach of fiduciary duty, the court found that an action for breach of fiduciary duty was equitable in nature. The court found that "[t]he [separation agreement] expressly provides that [plaintiff] released [defendant] from all claims, which by definition includes equitable actions. [Citation.] Thus, in accordance with established precedent, and the plain language of the [separation agreement] itself, it would appear that the parties envisioned the release of any claim related to breach of fiduciary duty." Accordingly, the trial court dismissed counts I and III of the second amended complaint, leaving count II, for breach of the separation agreement, pending.

¶ 42 Plaintiff asked the court to make a Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010)) finding to permit immediate appeal, but that motion was denied. Plaintiff also filed a motion to reconsider, which was also denied. On March 14, 2016, plaintiff voluntarily dismissed count II of its second amended complaint, and this appeal followed.

¶ 43                                      ANALYSIS

¶ 44 On appeal, plaintiff argues that the trial court erred in dismissing count I of the complaint because the separation agreement was not effective. Plaintiff also argues that the trial court erred in dismissing count III of the complaint because plaintiff did not release its claim for breach of fiduciary duty. We consider each argument in turn.

¶ 45                                    I. Jurisdiction

¶ 46 As an initial matter, we must consider our jurisdiction over the instant appeal. Although not discussed by either party, as an appellate court, we are required to consider our jurisdiction, even if the parties do not raise the issue. *A.M. Realty Western L.L.C. v. MSMC Realty, L.L.C.*, 2016 IL App (1st) 151087, ¶ 67. The question of whether we have jurisdiction over the instant appeal presents a question of law, which we review *de novo*. *In re Marriage of Demaret*, 2012

IL App (1st) 111916, ¶ 25; *In re Marriage of Gutman*, 232 Ill. 2d 145, 150 (2008). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 47 In the case at bar, the trial court dismissed counts I and III of plaintiff's complaint, leaving count II pending; the trial court denied plaintiff's request for Rule 304 language. Plaintiff later voluntarily dismissed count II of the complaint without prejudice pursuant to section 2-1009 of the Code (735 ILCS 5/2-1009 (West 2014)) and filed a notice of appeal. The question, then, is whether the voluntary dismissal of a complaint without prejudice constitutes an appealable order with respect to a plaintiff. As our supreme court's guidance on this question has changed over the years, we must carefully consider the current state of the law as to our jurisdiction to consider such an appeal.

¶ 48 Section 2-1009(a) of the Code provides that "[t]he plaintiff may, at any time before trial or hearing begins, *** dismiss his or her action or any part thereof as to any defendant, without prejudice, by order filed in the cause." 735 ILCS 5/2-1009(a) (West 2014). In 1984, our supreme court found that the voluntary dismissal of a complaint is final and appealable as to the defendants because "[t]he defendants' rights may have been prejudiced by the plaintiff's voluntary dismissal, but the defendants have no recourse unless they can appeal." *Kahle v. John Deere Co.*, 104 Ill. 2d 302, 306 (1984). However, with respect to plaintiffs, the supreme court held that "[t]his order cannot be appealed by the plaintiff since he requested the order, and *** he is protected from prejudice by the statute of limitations which gives him the absolute right to refile the case within one year of a voluntary dismissal without prejudice." *Kahle*, 104 Ill. 2d at 306.

¶ 49 In 1996, however, the supreme court was presented with a case in which the trial court had granted a motion to dismiss several counts of the plaintiffs' complaint and the plaintiffs then voluntarily dismissed the remaining counts and appealed the dismissal of the counts that had been involuntarily dismissed.[2] *Rein v. David A. Noyes & Co.*, 172 Ill. 2d 325, 329-30 (1996). After the appeal, the plaintiffs refiled a complaint alleging the same counts as in the original complaint, and the supreme court was asked to determine, *inter alia*, whether the voluntary dismissal of several counts of the original complaint barred the refiling of those counts due to *res judicata*. *Rein*, 172 Ill. 2d at 336-37. The supreme court did not address the propriety of the initial appeal or whether the appellate court in the first case had jurisdiction. See *Hudson v. City of Chicago*, 228 Ill. 2d 462, 487-89 (2008) (Kilbride, J., dissenting).

¶ 50 The next year, in *Dubina v. Mesirow Realty Development, Inc.*, 178 Ill. 2d 496, 503 (1997), in another case involving a voluntary dismissal, the supreme court stated:

> "The voluntary dismissal terminated the action in its entirety. All pending claims were dismissed. The order of voluntary dismissal, because it disposed of all matters pending before the circuit court, rendered all orders which were final in nature, but which were not previously appealable, immediately final and appealable. It is well settled that final orders entered in a case become appealable following a voluntary dismissal. [Citations.]"

---

[2]We note that the appellate court in that case found that it had jurisdiction to consider the appeal because "the voluntary dismissal of the remaining counts left nothing pending before the trial court." *Rein v. David A. Noyes & Co.*, 230 Ill. App. 3d 12, 15 (1992). The appellate court did not discuss *Kahle* in its jurisdictional analysis.

In this discussion, the supreme court cited the *Rein* appellate court's holding that it had jurisdiction with approval (*Dubina*, 178 Ill. 2d at 503) and, later, specifically noted that the *Rein* appellate court "determined that it had jurisdiction because the voluntary dismissal terminated all claims pending in the circuit court" (*Dubina*, 178 Ill. 2d at 505). The *Dubina* court did not distinguish between the situation in *Rein*, where it was the plaintiffs appealing, from the situation present in *Dubina*, where it was the defendant appealing.

¶ 51    In 2008, the supreme court again discussed the relationship between a voluntary dismissal and *res judicata* in *Hudson*, 228 Ill. 2d 462, a decision which heavily relied on the analysis in *Rein*. Justice Kilbride filed a lengthy dissent, in which he argued that the supreme court should take the opportunity "to limit or overrule *Rein*." *Hudson*, 228 Ill. 2d at 484 (Kilbride, J., dissenting). The dissent argued that the appellate court in the first *Rein* case "erroneously assumed that it had jurisdiction to hear the initial appeal when there was no final and appealable judgment in the lawsuit." *Hudson*, 228 Ill. 2d at 487 (Kilbride, J., dissenting). The dissent stated:

> "Applying our supreme court rules to *Rein I*, there can be no question that the plaintiffs' voluntary dismissal of their common law claims did not convert the involuntary dismissal of the rescission counts into a final and appealable order because the plaintiffs had the option to refile their voluntarily dismissed claims under section 2-1009(a) of the Code. *** Since a dismissal under section 2-1009(a) is *without prejudice*, section 2-1009(a) protects a plaintiff's right to refile the voluntarily dismissed action.

> *Rein*'s conclusion that the plaintiffs' voluntary dismissal of their common law claims made the involuntary dismissal of the rescission claims final and appealable is in direct conflict with other decisions of this court. Prior to *Rein*, this court consistently held that entry of a dismissal order cannot be considered final and appealable by a plaintiff during the time when the refiling option is available under section 13-217 because a plaintiff has an *absolute* right to refile the action under section 13-217. [Citations.]" (Emphases in original.) *Hudson*, 228 Ill. 2d at 488-89 (Kilbride, J., dissenting).

¶ 52    The dissent noted that the *Kahle* court made clear that a plaintiff could not appeal from an order voluntarily dismissing a claim without prejudice because the plaintiff had the right to refile the case and stated that, "[t]hus, in *Rein*, this court incorrectly assumed that the plaintiffs' appeal in *Rein I* was proper." *Hudson*, 228 Ill. 2d at 489 (Kilbride, J., dissenting). The dissent argued that the incorrect assumption was further perpetuated in *Dubina*, where the court held that the plaintiffs' voluntary dismissal made all prior orders entered in the action final and appealable. *Hudson*, 228 Ill. 2d at 490 (Kilbride, J., dissenting). The dissent argued that the *Dubina* court should have relied on *Kahle*, not *Rein*, since *Rein* did not consider the appealability of the issues, and further argued that the *Dubina* court relied on cases that "were based on a misinterpretation of existing precedent and a misreading of *Kahle*." *Hudson*, 228 Ill. 2d at 490 (Kilbride, J., dissenting). The dissent thus argued that the supreme court should clarify that a plaintiff's voluntary dismissal was not the jurisdictional basis for an appeal but that, instead, precedent "prohibits plaintiffs from taking an appeal from a voluntary dismissal, but permits defendants to take an appeal from a plaintiff's voluntary dismissal upon a showing of prejudice." *Hudson*, 228 Ill. 2d at 491 (Kilbride, J., dissenting).

¶ 53    The supreme court was most recently presented with a case involving a voluntary dismissal in 2016 in *Richter v. Prairie Farms Dairy, Inc.*, 2016 IL 119518, a case in which the plaintiffs voluntarily dismissed their lawsuit and then later sought to refile it. In considering the defendants' claim-splitting argument, the supreme court relied on both *Rein* and *Hudson*, stating "[a] voluntary dismissal pursuant to section 2-1009 terminates the entire action and renders immediately appealable all final orders entered therein that were not previously appealable." *Richter*, 2016 IL 119518, ¶ 39. Thus, despite the *Hudson* dissent's urging, the current state of the law appears to be that a voluntary dismissal is appealable, regardless of whether the appeal is filed by the plaintiff or the defendant.

¶ 54    In the case at bar, the trial court's order granting the motion to dismiss was a final order. Once plaintiff voluntarily dismissed the remaining count of the complaint, that order became appealable. Accordingly, based on the current state of the law, we have jurisdiction to consider the instant appeal.

¶ 55                                              II. Count I

¶ 56    We first consider plaintiff's argument concerning the dismissal of count I of its complaint. Both counts of the complaint were dismissed under section 2-615 of the Code. A motion to dismiss under section 2-615 of the Code challenges the legal sufficiency of the complaint by alleging defects on its face. *Young v. Bryco Arms*, 213 Ill. 2d 433, 440 (2004); *Wakulich v. Mraz*, 203 Ill. 2d 223, 228 (2003). The critical inquiry is whether the allegations in the complaint are sufficient to state a cause of action upon which relief may be granted. *Wakulich*, 203 Ill. 2d at 228. In making this determination, all well-pleaded facts in the complaint and all reasonable inferences that may be drawn from those facts are taken as true. *Young*, 213 Ill. 2d at 441. In addition, we construe the allegations in the complaint in the light most favorable to the plaintiff. *Young*, 213 Ill. 2d at 441. We review *de novo* an order granting a section 2-615 motion to dismiss. *Young*, 213 Ill. 2d at 440; *Wakulich*, 203 Ill. 2d at 228. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 57    On appeal, plaintiff argues that the trial court erred in dismissing count I of the complaint, which was for breach of the management agreement, because the separation agreement never became effective and, even if it had, it did not supersede plaintiff's claims under the management agreement.

¶ 58    "In construing a contract, the primary objective is to give effect to the intention of the parties." *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011) (citing *Gallagher v. Lenart*, 226 Ill. 2d 208, 232 (2007)). The court will first look to the language of the contract itself to determine the parties' intent, and the contract must be construed as a whole, "viewing each provision in light of the other provisions." *Thompson*, 241 Ill. 2d at 441. "The parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract." *Thompson*, 241 Ill. 2d at 441. "If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Thompson*, 241 Ill. 2d at 441 (citing *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004)). "A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the

language used. [Citation.] Further, when parties agree to and insert language into a contract, it is presumed that it was done purposefully, so that the language employed is to be given effect. [Citation.]" *Thompson*, 241 Ill. 2d at 442. The interpretation of a contract involves a question of law that we review *de novo*. *Carr v. Gateway, Inc.*, 241 Ill. 2d 15, 20 (2011). As noted, *de novo* consideration means we perform the same analysis that a trial judge would perform. *Khan*, 408 Ill. App. 3d at 578.

¶ 59    In the case at bar, plaintiff first argues that the separation agreement never became effective because defendant did not sign and deliver the separation agreement prior to plaintiff's April 1 withdrawal of its acceptance. We do not find this argument persuasive. First, as the trial court noted, the separation agreement expressly provided that it "is made effective as of this 25th day of March, 2013." " '[I]t is elementary that ordinarily a contract speaks from the day of its date, regardless of when it was executed and delivered.' " *Janowiak v. Tiesi*, 402 Ill. App. 3d 997, 1003 (2010) (quoting *Monahan v. Fidelity Life Insurance Co.*, 148 Ill. App. 171, 174 (1909), *aff'd*, 242 Ill. 488 (1909)); see also *Asset Recovery Contracting, LLC v. Walsh Construction Co. of Illinois*, 2012 IL App (1st) 101226, ¶ 62. "[T]he date on the contract is ordinarily the effective date, and where the contract is executed later, its contractual terms relate back and are effective from the date of the contract if such coverage is clear from the face of the contract ***." *Asset Recovery Contracting*, 2012 IL App (1st) 101226, ¶ 63. Thus, plaintiff's argument that the trial court "ignor[ed]" plaintiff's allegation that the executed separation agreement was not delivered to plaintiff until April 2 is without merit because, by its terms, the separation agreement was effective on March 25, 2013, regardless of when it was executed.

¶ 60    Furthermore, article 5 of the separation agreement provided that "[t]his Agreement when executed by [defendant] will have been fully and validly executed and delivered by [defendant] and will constitute legal, valid and binding obligations of [defendant], enforceable in accordance with its terms." Thus, under the terms of the separation agreement, delivery of the agreement occurred at the time of execution, not at the time that plaintiff actually received the agreement, as plaintiff argues on appeal. Plaintiff's complaint does not allege when the separation agreement was executed by defendant. Accordingly, we cannot accept its claim that it revoked its acceptance of the separation agreement prior to its becoming effective.

¶ 61    Additionally, we find no error in the trial court's conclusion that plaintiff was bound to the terms of the separation agreement. In article 4 of the separation agreement, plaintiff represented and warranted to defendant that "[t]his Agreement when executed by [plaintiff], Julie Darling and Sean Mulroney, will have been fully and validly executed and delivered by them and will constitute legal, valid and binding obligations of [plaintiff], enforceable in accordance with its terms." Thus, at the time that plaintiff executed the separation agreement, it became bound by its terms. We also note that in its complaint, plaintiff alleges that the parties negotiated and "agreed in principle" to the separation agreement prior to its execution. " 'It is well settled that a party named in a contract may, by his acts and conduct, indicate his assent to its terms and become bound by its provisions even though he has not signed it.' " *Asset Recovery Contracting*, 2012 IL App (1st) 101226, ¶ 64 (quoting *Landmark Properties, Inc. v. Architects International-Chicago*, 172 Ill. App. 3d 379, 383 (1988)). This allegation undermines plaintiff's argument on appeal that there was no enforceable contract.

¶ 62    However, the fact that the separation agreement was effective does not automatically mean that plaintiff was not entitled to file suit for breach of the management agreement. The trial

- 15 -

court found that, pursuant to section 9.9, the separation agreement "expressly replaced the [management agreement], and *** as it appears the [separation agreement] became effective by March 25, 2013, such constitutes the termination of the [management agreement], and [plaintiff's] waiver of [defendant's] alleged breach thereunder." As noted, section 9.9 was entitled "Entire Agreement; Assignment," and provided, in relevant part:

> "This Agreement (including any scheduled, exhibits or annexes hereto) (i) constitutes the entire agreement, and supersedes all other prior agreements, understandings, representations, and warranties, both written and oral, among the parties with respect to the subject matter hereof ***."

On appeal, plaintiff argues that this language does not support the trial court's finding that the entire management agreement was replaced by the separation agreement such that plaintiff is unable to file suit for earlier breaches of the management agreement. We agree.

¶ 63    By its express terms, section 9.9 supersedes all prior agreements among the parties "with respect to the subject matter hereof." The separation agreement indicated that the purpose of the agreement was for plaintiff to resign as manager of the restaurant and member of the LLC, and for defendant to redeem plaintiff's interest in the LLC. In other words, the subject matter of the separation agreement was the transfer of plaintiff's interest in the restaurant and the LLC to defendant. By contrast, the management agreement was a more comprehensive document, governing the operation of the restaurant and the parties' duties thereunder. Of course, once the separation agreement took effect, the provisions of the management agreement would no longer be operative, as plaintiff would no longer be operating or managing the restaurant. However, there is nothing in the separation agreement that indicates that plaintiff would lose the ability to seek recourse for earlier breaches of the management agreement. For instance, the complaint alleges that plaintiff was never paid its management fee. Nothing in the separation agreement indicates that plaintiff has somehow lost its ability to file suit for that breach, especially not a clause that simply states that the separation agreement governs the transfer of the business between plaintiff and defendant. The separation agreement was a new agreement that governed the parties going forward; it did not release the parties' prior obligations.

¶ 64    We also note that the merger clause in the separation agreement is drafted more narrowly than the merger clause in *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 466 (1999), a case relied on by defendant. The merger clause there provided that the " '[c]ontract represents the entire and integrated agreement between the parties hereto and supersedes all prior negotiations, representations, or agreements, either written or oral.' " *Air Safety*, 185 Ill. 2d at 460. By contrast, the merger clause in section 9.9 only provided that "[t]his Agreement (including any scheduled, exhibits or annexes hereto) (i) constitutes the entire agreement, and supersedes all other prior agreements, understandings, representations, and warranties, both written and oral, among the parties *with respect to the subject matter hereof*." (Emphasis added.) Thus, the scope of the instant merger clause is more narrowly drawn. Had the parties intended for the separation agreement to entirely replace the management agreement, they could have easily drafted section 9.9 more broadly. Instead, the express terms of the merger clause indicate that the separation agreement replaces only the portions of any prior agreements related to the subject matter of the separation agreement, namely, the transfer of plaintiff's interest in the restaurant and the LLC to defendant. "[W]hen parties agree to and insert language into a contract, it is presumed that it was done purposefully, so that the language employed is to be given effect." *Thompson*, 241 Ill. 2d at 442. Here, the parties chose

to insert language narrowing the scope of the merger clause, and we will not read the separation agreement in such a way as to render that language meaningless. See *Thompson*, 241 Ill. 2d at 442 ("A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used."). Accordingly, while the separation agreement became effective March 25, 2013, it superseded only those portions of the management agreement related to the subject of the termination of the management agreement. Plaintiff is still able to state a claim for prior breaches of the management agreement unrelated to the management agreement's termination and, consequently, the trial court erred in dismissing count I of plaintiff's complaint.

¶ 65                                              III. Count III

¶ 66        Plaintiff also argues that the trial court erred in dismissing count III of its complaint, for breach of fiduciary duty, based on its finding that plaintiff had released such claims under the separation agreement. The trial court found that "[t]he [separation agreement] expressly provides that [plaintiff] released [defendant] from all claims, which by definition includes equitable actions. [Citation.] Thus, in accordance with established precedent, and the plain language of the [separation agreement] itself, it would appear that the parties envisioned the release of any claim related to breach of fiduciary duty." However, we agree with plaintiff that the trial court and defendants read provisions into the separation agreement that are simply not present.

¶ 67        A release " 'is the abandonment of a claim to the person against whom the claim exists.' " *Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 21 (2003) (quoting *Hurd v. Wildman, Harrold, Allen & Dixon*, 303 Ill. App. 3d 84, 88 (1999)); *Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill. App. 3d 605, 614 (2007). It is a contract and is therefore governed by contract law. *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447 (1991) (citing *Polo National Bank v. Lester*, 183 Ill. App. 3d 411, 414 (1989)). "The rights of the parties are limited to the terms expressed in the agreement." *International Insurance Co. v. Sargent & Lundy*, 242 Ill. App. 3d 614, 622 (1993) (citing *Murphy v. S-M Delaware, Inc.*, 95 Ill. App. 3d 562, 565 (1981)). "Where a release is clear and explicit, the court must enforce it as written." *International Insurance Co.*, 242 Ill. App. 3d at 623 (citing *Continental Illinois National Bank & Trust Co. v. Sax*, 199 Ill. App. 3d 685, 693 (1990)). However, " '[r]eleases are strictly construed against the benefitting party and must spell out the intention of the parties with great particularity.' " *Construction Systems, Inc. v. FagelHaber, LLC*, 2015 IL App (1st) 141700, ¶ 25 (quoting *Fuller Family Holdings*, 371 Ill. App. 3d at 614).

¶ 68        In the case at bar, there is simply no release of any claims between the parties contained in the separation agreement. The provisions pointed to by the trial court, and by defendant on appeal, may *reference* releases, but they are not releases themselves, and such releases are not actually inserted anywhere into the separation agreement itself. For instance, defendant cites section 2.2 of the separation agreement, which provides in paragraph 2.2(a) that "[i]n consideration of the sale to [defendant] by [plaintiff] of the Redeemed Interest and the other terms and conditions hereof, including the release and restrictive covenants, [defendant shall] deliver to [plaintiff] a separation fee as calculated by the formula set below (hereinafter the 'Purchase Price')." There is certainly a release referenced by the provision, but there can be no argument that this provision itself constitutes a release. Similarly, the recitals section of the separation agreement provides that "[defendant] is willing to redeem [plaintiff's] Interest, as

- 17 -

partial consideration for the releases and agreements set forth herein." Again, while this recital clearly references "releases," it is certainly not a release itself.

¶ 69    Defendant claims that the release itself is contained in section 3.2 of the separation agreement. Article 3 was entitled "Resignation and Release" and provided, in full:

> "3.1 *Resignation.* [Plaintiff] hereby resigns from its positions as a manager, director or officer of the Argent Restaurant LLC, effective upon Separation of this Agreement.
>
> 3.2 *Claims, Demands and Causes of Action.* As used in this Agreement, 'claims,' 'demands,' and 'causes of action' include, but are not limited to, claims based on contract, whether express or implied, fraud, stock fraud, defamation, wrongful termination, estoppel, equity, tort, retaliation, intellectual property, personal injury, spoliation of evidence, emotional distress, public policy, wage and hour law, statute or common law, claims for severance pay, claims related to stock options and/or fringe benefits, claims for attorneys' fees, vacation pay, debts, accounts, compensatory damages, punitive or exemplary damages, liquidated damages, and any and all claims arising under any federal, state, or local statute, law or ordinance prohibiting discrimination on account of race, color, sex, age, religion, sexual orientation, disability or national origin, including but not limited to, the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964 as amended, the Americans with Disabilities Act, the Family and Medical Leave Act, the Employee Retirement Income Security Act[,] the Illinois Human Rights Act[,] and claims for compensatory damages, punitive damages, and/or liquidated damages."

¶ 70    The fatal flaw to defendant's argument is that section 3.2 is merely a definitional section. It does nothing itself. This can be seen by the first part of the provision: "As used in this Agreement, 'claims,' 'demands,' and 'causes of action' include, but are not limited to ***." The list of types of actions following that introductory phrase are merely items that are included in the terms "claims," "demands," and "causes of action." While the article is entitled "Resignation and Release," we cannot find that calling the article a "[r]elease" transforms the contents of the article into a release. This is especially true where section 9.7 of the separation agreement, which was entitled "Captions," instructs that "[t]he Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof." See *BMO Harris Bank National Ass'n v. LaRosa*, 2017 IL App (1st) 161159, ¶ 21 (finding that "[w]e cannot ascribe intent through the title of the section" when interpreting a statute).

¶ 71    Defendant argues that "[t]here is no question that the parties intended for the Separation Agreement to release any claims that [plaintiff] could assert against [defendant] including any claims for breach of fiduciary duty." However, this assertion is not supported by any language in the separation agreement itself. Defendant also does not explain how, in the absence of express language, such a release should be interpreted. Releases can be general or specific, and the scope of releases is a subject of frequent litigation. It is impossible to interpret a release without any express language present.

¶ 72    "The rights of the parties are limited to the terms expressed in the agreement." *International Insurance Co.*, 242 Ill. App. 3d at 622 (citing *Murphy*, 95 Ill. App. 3d at 565). Here, there are simply no terms expressed in the agreement that operate to release any claims. Furthermore, " '[r]eleases are strictly construed against the benefitting party and must spell out

the intention of the parties with great particularity.' " *Construction Systems, Inc.*, 2015 IL App (1st) 141700, ¶ 25 (quoting *Fuller Family Holdings*, 371 Ill. App. 3d at 614). We will not read a release into a contract where one is not expressly provided. See *Clarendon America Insurance Co. v. 69 West Washington Management, LLC*, 374 Ill. App. 3d 580, 589 (2007) ("[W]e will not insert language into the agreement that [the parties] could easily have included."). Accordingly, the trial court erred in dismissing count III of plaintiff's claim on this basis.

¶ 73 However, since we may affirm the trial court's dismissal on any basis in the record, we must consider whether plaintiff stated a claim for breach of fiduciary duty. "To state a claim for breach of fiduciary duty, a plaintiff must allege the existence of a fiduciary duty, a breach of that duty, and damages proximately caused by the breach." *Covinsky v. Hannah Marine Corp.*, 388 Ill. App. 3d 478, 489 (2009) (citing *Jaffe Commercial Finance Co. v. Harris*, 119 Ill. App. 3d 136, 143 (1983)). Plaintiff's complaint alleges the existence of a fiduciary duty, as the complaint alleges that plaintiff and defendant were co-members of the LLC. It is well-established that members of a limited liability company owe fiduciary duties to other members, including the duties of loyalty and care. See 805 ILCS 180/15-3 (West 2012). Plaintiff's complaint also alleges a breach of fiduciary duty, as it alleges that defendant commingled funds between the LLC and defendant's own accounts, diverted funds from the LLC into defendant's accounts, and refused to permit plaintiff access to the LLC's books and records. Finally, plaintiff's complaint alleges damages proximately caused by the breach, as it alleges that defendant's breaches prevented plaintiff from realizing profit from the restaurant's operations, including payment of its management fee and repayment of its capital contribution. Accordingly, plaintiff's complaint stated a cause of action for breach of fiduciary duty, and count III should not have been dismissed.

¶ 74                                    CONCLUSION
¶ 75 For the reasons set forth above, the trial court erred in dismissing counts I and III of plaintiff's second amended complaint under section 2-615 of the Code. The existence of the separation agreement did not prevent plaintiff from filing suit for earlier breaches of the management agreement, and the separation agreement did not contain a release of plaintiff's breach of fiduciary duty claims.

¶ 76 Reversed.