2022 IL App (1st) 1210034-U

No. 1-21-0034

Second Division
June 30, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PARAMJIT SIDHU, individually and on behalf of Morris Cancer Center, LLC, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee/Cross-Appellant, | ) ) ) | No. 18 CH 7460 |
| v. | ) ) | |
| MORRIS CANCER CENTER, LLC, PUNDALEEKA FAMILY HOLDINGS, LLC, SARODE PUNDALEEKA, and SURENDER DHIMAN, | ) ) ) ) | Honorable Diane M. Shelley Judge, presiding. |
| Defendants-Appellants/Cross-Appellees. | ) ) ) | |

JUSTICE COBBS delivered the judgment of the court.
Justices Howse and Lavin concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court's judgment for plaintiff-appellee/cross-appellant for defendant-appellant/cross-appellee's breach of the limited liability company's operating agreement claim was proper. The trial court's judgment against plaintiff-appellee/cross-appellant for failure to meet its burden on its breach of fiduciary duty

claim as to two defendant members was also proper. However, the trial court failed to rule on the breach claim as it relates to the defendant majority member.

¶ 2     This case concerns proceedings related to the Illinois Limited Liability Act (Act) (805 ILCS 180/1-1, *et seq.* (West 2016)) in accordance with a governing operating agreement for an Illinois limited liability company. Following a bench trial, the trial court found that defendant-appellant/cross-appellee, Pundaleeka Family Holdings, LLC (PFH) breached the entity's operating agreement when it amended the agreement without unanimous consent of its membership, and in effect impermissibly altered the membership interests of its members. The trial court also found against plaintiff-appellee/cross-appellant for a breach of fiduciary duty claim. For the following reasons, we affirm in part and remand with instructions.

¶ 3                                    I. BACKGROUND

¶ 4                          A. Morris Cancer Center, LLC (MCC)

¶ 5     On January 14, 2003, MCC was organized as a member-managed Illinois limited liability company pursuant to the Act.[1] The sole purpose of MCC was to own, manage, lease, and operate a professional medical building in Joliet, Illinois (the Property), which was constructed in 2004. MCC was originally comprised of seven members and was governed by an operating agreement executed on February 1, 2003. Relevant to this appeal, defendant-appellant/cross-appellee, Sarode Pundaleeka, was expressly designated within the original operating agreement as "managing member of MCC." Other members included defendant-appellant/cross-appellee, Surender Dhiman, and Sanjiv Modi, who is not a party to this action. Plaintiff-appellee/cross-appellant, Paramjit Sidhu, was MCC's registered agent.

---

[1] As will be discussed later, the trial court later found that, despite being identified in the operating agreement as a member-managed LLC, MCC had effectively designated a majority-interest member as manager.

¶ 6                                    B. The Amended Operating Agreement

¶ 7    On December 31, 2012, three of the original MCC members disassociated from the entity, leaving Pundaleeka, Dhiman, Sidhu, and Modi as the only members. These four members held the following membership interests in MCC: (a) Pundaleeka, through his holding company, PFH, at 83.6%; (b) Dhiman at 9.5%; (c) Sidhu at 5%; and (d) Modi at 1.9%.[2]

¶ 8    Pursuant to the amended operating agreement, a "membership interest" was defined as a "Member's entire interest in [MCC] including such Member's *Economic Interest* and the right to participate in the management of the business and affairs of [MCC], including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members[.]" (Emphasis added). "Economic Interest" was defined as a "Member's *** share of one or more of the [MCC's] *Net Profits*, Net Losses, and *distributions* of [MCC's] assets[.]" (Emphasis added). Lastly, "Percentage Interest" was defined as "the percentage interest in [MCC] as set forth [in the agreement], as may be changed from time to time by the unanimous vote of the Members."

¶ 9    Pursuant to Section 1.01(n) of the amended operating agreement, a "majority interest" was defined as "one or more Interests of Members which in the aggregate exceed 50% of all Percentage Interests." Additionally, pursuant to Section 5.04, 50% of all those holding a Percentage Interest in MCC could vote to approve the sale of its assets. Section 5.03 further provided that a member holding "more than 50% of all Percentage Interest *** [had] full and complete authority, power [,] and direction to manage and control the business and affairs and properties of [MCC], to make all decisions concerning the sale, purchase, lease, and mortgage of the real estate of [MCC], and

---

[2] At some point between 2015 and 2017, Pundaleeka transferred his entire interest in MCC to PFH. However, the record is unclear as to the exact date on which this occurred.

to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of [MCC's] business[.]"

¶ 10    As to the administration of MCC, Section 5.03 provided that the "business and affairs of [MCC] shall be reserved to the members. The Members shall, by the affirmative vote of Members holding more than 50% of all Percentage Interest, direct, manage[,] and control the business of [MCC]." At 83.6%, Pundaleeka, on behalf of PFH, served as the majority interest holder in MCC.

¶ 11    Finally, Section 12.05 of the operating agreement provided that the agreement could "not be amended except in writing by the affirmative vote of Members holding at least [s]eventy five percent (75%) of all Percentage Interests." However, if any amendment sought to "chang[e] the Percentage Interests of the Members," such an amendment would require "the unanimous vote of the Members."

¶ 12                            C. The 2017 Amendment

¶ 13    At some point in 2017, Pundaleeka contemplated selling the Property. On August 11, 2017, an "Agreement for Purchase and Sale of Real Estate" was entered into between MCC and Community Healthcare Trust, Services (CHT). Pundaleeka, as agent of PFH, signed the purchase agreement on behalf of MCC. Significantly, the purchase agreement contained a non-competition provision, which read, in its entirety:

> "Non-Compete. Seller agrees that, during the term of the Lease(s) as extended, it will not own, nor permit *** Pundaleeka (or an entity controlled by *** Pundaleeka), to develop, manage, lease, operate or have an ownership interest in any building within an 8-mile radius of the Property which leases space to any Tenants during the Term of their leases."

¶ 14    On November 28, 2017, Pundaleeka, acting on behalf of PFH, and Dhiman executed an amendment to section 8.02 of the operating agreement. No notice was sent to the other members of MCC prior to the signing of the amendment. The amendment read, in pertinent part:

"AMENDMENT TO MORRIS CANCER CENTER, LLC OPERATING AGREEMENT EFFECTIVE MAY 2, 2012.

\*\*\*    \*\*\*\*

WHEREAS this Operating Agreement is amended pursuant to Section 12.05 of the Operating Agreement in writing with approval of greater than 75% of the ownership of Pranav, LLC.[3]

Section 8.02 of the Operating Agreement is hereby amended to provide that in the event that any real property, including but not limited to 1600 W. Route 6, Joliet, Illinois is sold by [MCC] for greater than its appraised value of 5.5 Million[,] any sale proceeds paid to [MCC] in excess of the appraised value as stated herein shall be paid to [PFH] without any offsets.

All other sections of the May 12, 2012 Operating Agreement shall remain in full force and effect and this amendment should not be construed as any change of Percentage Interest of ownership of any member."

¶ 15    On November 30, 2017, Pundaleeka sent an email to all members of MCC, informing them of the amendment's execution, and that a conference call had been scheduled for December 5, 2017, for any further discussion on the matter.

---

[3] "Pranav, LLC" is an unrelated entity owned by, among others, Dhiman and Pundaleeka. Dhiman and Pundaleeka apparently executed a similar amendment for Pranav contemporaneously with the amendment for MCC, and the evidence at trial suggested that this was a scrivener's error.

¶ 16    On December 4, 2017, Modi objected to the amendment by email. Modi demanded that Pundaleeka not proceed with the distribution until discussion of the amendment occurred.

¶ 17                              D. Sale of the Property

¶ 18    Sometime in December 2017 or January 2018, CHT discovered various easements on the Property. On January 12, 2018, Pundaleeka sent the members of MCC a copy of a letter dated December 19, 2003, from Ruttiger, Tonelli & Associates, an engineering firm, which indicated that the building and parking areas of the Property were encumbered by easements. Specifically, as to Sidhu, Pundaleeka sought to know why the easement issues had not been resolved back in 2003. Sidhu responded that he had been unaware of the issue and if he had received the 2003 letter, he had-probably been on vacation at the time.

¶ 19    On February 7, 2018, Pundaleeka sent another email to the members of MCC, which provided some updates to the sale of the Property. He indicated that he was planning to put together a deed that would place all proceeds from the sale in the name of PFH for tax-related purposes. He also stated that there had "been many problems that had not been taken care of by *** Sidhu[.]" Significantly, Pundaleeka noted that "[t]here was easement problems from all the utility companies[,] i.e., AT[&]T, Nicor Gas, ComEd[,] [and] [c]ity water and sewer easements." He again referenced the 2003 letter, and stated that the easement issues were "taken care of recently this week after going through a long ordeal with the city of Morris[.]" Pundaleeka indicated that this had been a major concern, and it had taken an "extra [four] [plus] months to get the closing done[.]"

¶ 20    On March 30, 2018, Pundaleeka, on behalf of PFH, and CHT executed a "First Amendment to Agreement for Purchase and Sale of Real Estate." The new agreement stated that the original purchase price of the Property had been reduced to $6,543,895. A "Non-Compete and Non-

Solicitation Agreement" was also drafted between CHT and Pundaleeka individually, which mirrored the non-competition provisions in the original purchase agreement.[4]

¶ 21    On April 12, 2018, Pundaleeka sent an email to the members of MCC, notifying them of the sale of the Property. He also provided his calculation of the breakdown of the net proceeds of the sale of the Property as follows: MCC would net $3,523,779.12 from the sale; PFH would receive a total of $1,143,895 in accordance with the executed 2017 amendment; and the other members were provided an estimate of their distribution. Pundaleeka also indicated that he was withholding Sidhu's distribution from the sale.

¶ 22    On April 27, 2018, and again on May 8, 2018, Sidhu objected to the withholding of his distribution via email.

¶ 23                              F. Pre-Trial Litigation

¶ 24    Because this matter resolved in a bench trial in the circuit court of Cook County, we summarize the procedural events of this case prior to trial to the extent that they are relevant. The operative complaint in this matter is a five-count Amended Complaint, brought by Sidhu, in his individual capacity, and derivatively on behalf of MCC (collectively, plaintiff) against Pundaleeka, PFH, and Dhiman (collectively, defendants). The crux of the complaint was that the execution of the 2017 amendment violated the operating agreement by causing Sidhu to receive less than a 5% distribution of the sale proceeds, thereby effectively reducing his membership interest without the requisite unanimous consent of all members.

¶ 25    Count I alleged a breach of the operating agreement in that the defendants had unlawfully amended the operating agreement via the 2017 amendment without calling a meeting to discuss

---

[4] Our review of the record does not reveal a signed non-competition agreement.

the amendment; had unlawfully passed the amendment without obtaining unanimous consent of all members pursuant to the operating agreement and the Act; had intentionally excluded Modi and Sidhu by executing the amendment and selling the Property without their consent; and had unlawfully withheld Sidhu's distribution on the net proceeds of the sale. Count II alleged violations of various sections of the Act based on conduct similar to that alleged in Count I. Count III alleged that defendants breached their fiduciary duties to the members by unlawfully executing the amendment; distributing the proceeds of the sale in a manner unauthorized by the operating agreement; and withholding Sidhu's distribution from the sale. Count IV alleged the same conduct derivatively, on behalf of MCC against all the defendants pursuant to the Act. Count V sought a declaration that the 2017 amendment was unenforceable, violated the amended operating agreement, and that Sidhu was entitled to a distribution in accordance with the agreement. Sidhu sought damages plus pre-judgement interest, punitive damages, and attorney fees and costs. Attached to the verified complaint were the amended operating agreement and purported 2017 amendment.

¶ 26    On April 22, 2019, defendants filed an answer to the amended complaint and two affirmative defenses, specifically waiver and the business judgment rule. Defendants also filed a counterclaim for breach of fiduciary duty against Sidhu, alleging that his gross negligence in failing to timely vacate the various easements on the Property resulted in a delay on the closing of the sale of the Property and damages of at least $170,000.

¶ 27    On May 22, 2019, Sidhu filed a verified answer to defendants' affirmative defenses, as well as a verified answer and an affirmative defense to Defendants' counterclaim. Written and oral discovery occurred, resulting in depositions of the various parties.

¶ 28    The parties filed counter motions for summary judgment, both of which were denied. Relevant here, in denying defendants' motion for summary judgment on Sidhu's complaint, the trial court found that, under the Act, the operating agreement could not be amended without unanimous consent. Additionally, the trial court determined that, pursuant to the operating agreement, "distribution interests were necessarily tied to membership interests," and that Sidhu had been entitled to a 5% allocation of all net profits and losses of the entity's operations. As such, Sidhu was entitled to 5% of the net profits from the sale, and the language of the 2017 amendment meant that Sidhu would be receiving less than that percentage. This change, the trial court reasoned, required unanimous consent of MCC members.

¶ 29    The matter proceeded with a virtual bench trial beginning on August 4, 2020.[5]

¶ 30                                    G. Trial

¶ 31                              1. Plaintiff's Witnesses

¶ 32                                    i. Sidhu

¶ 33    Sidhu testified as follows. He currently served as the administrator for Joliet Oncology-Hematology Associates (JOHA). He began working there in 2001 after being hired by Pundaleeka and Dhiman to run both of their respective medical practices, JOHA and Community Orthopedics. Pundaleeka knew that Sidhu did not have experience managing a medical practice, but believed that he could "handle the job well."

¶ 34    Sidhu's compensation arrangement was an annual salary of $115,000 with a guaranteed year-end bonus of $20,000. In addition to other benefits, he was also offered a 5% "sweat equity"

---

[5] The bench trial elicited testimony from witnesses for both plaintiff and defendants' cases-in-chief. Because the instant appeal and cross-appeal only concern claims within Sidhu's complaint, we only recite the testimony of such witnesses relevant to those claims.

interest in all new projects to be started by the practice groups. At the time Sidhu was offered the position, JOHA was considering starting a new imaging center called Future Diagnostics Group, which would include a new project, MCC.

¶ 35    MCC was formed in 2003, and Pundaleeka was designated as the managing member. Sidhu assisted Pundaleeka with the management of MCC, including overseeing the construction of the Property, which required collaboration with bankers, the city of Morris, contractors, and architects. Following the construction of the building in 2004, Sidhu was responsible for maintaining the Property and acquiring new tenants, but required Pundaleeka's approval to resolve any issues.

¶ 36    Sidhu further testified that he received distributions from MCC following its formation in 2003. These distributions were calculated from the entity's income statements at the end of each year, depending on the amount of profits or losses incurred from that year. Sidhu's 5% share would come out of a "K-1"[6] pursuant to Sections 8.01 and 8.03 of the operating agreement. He also received a "management fee" through an entity called Shravan, LLC, where Pundaleeka had a 75% interest and Sidhu had 25%. The management fee was derived from rental payments made to MCC.

¶ 37    Pundaleeka and Dhiman amended the operating agreement in 2017, but Sidhu did not learn about the amendment until he received an email from Pundaleeka two days after the amendment was signed. Sidhu did not agree with the amendment and objected to it via email.

¶ 38    In 2018, the Property was sold to a third-party. Sidhu was not personally involved in the sale nor aware of its terms, as Pundaleeka did not ask him to assist. He became aware of the Property's closing via email from Pundaleeka, which indicated how the proceeds of the sale would

---

[6] A "Schedule K-1" is an Internal Revenue Service (RS) tax form issued annually for an investment in a partnership or similar entity, and its purpose is to report each share of the entity's earnings, losses, deductions, and credits.

be distributed. The sale price of the Property was approximately $6.43 million, and the purchase price had been reduced by about $100,000 due to a decrease in rent payment from JOHA. The estimated distribution was about $2.38 million. Sidhu's share was calculated by Pundaleeka. The quoted amount, according to Sidhu, constituted about 2%. Based on his calculated share, Sidhu believed that the 2017 amendment changed the members' percentage interests because any purported distributions from the sale of the Property had been calculated based on the language of the amendment.

¶ 39 Sidhu testified that Pundaleeka also indicated in email communications that Sidhu had delayed the sale of Property by failing to vacate various easements, resulting in additional costs, including attorney fees and interest expenses on outstanding loans. Pundaleeka asserted that he would withhold Sidhu's share of the proceeds until resolution. Sidhu did not agree with the withholding of his distribution and believed Pundaleeka was exaggerating the costs of the delay.

¶ 40 Sidhu was on vacation at the time he may have received any initial notification regarding the easements. He "immediately went back into his folders in his office" and could not find any further records of the alleged communication. He was "at a loss for what happened" and felt "responsible as an employee." Sidhu attempted to provide assistance to Pundaleeka regarding the easement issue, but Pundaleeka never met with Sidhu in person and did not respond to any further communications.

¶ 41 Finally, Sidhu testified that, to date, he never received any distributions from the sale, and instead received a "K-1" from MCC in 2018, which reflected an increase to his capital account from the proceeds of the sale. As such, he had to pay a larger amount of taxes on the account and because he did not have enough money in the account to do so, he had to close a separate 401(k) account prematurely to avoid a tax penalty.

¶ 42                                            ii. Pundaleeka

¶ 43    Next, Pundaleeka was called as an adverse witness, and testified as follows. Pundaleeka is a retired physician and had known Sidhu since 2001 when he and Dhiman hired him to serve as administrator for their respective medical practices. Regarding the operations of MCC, Pundaleeka testified that although he was managing member and many of Sidhu's responsibilities as administrator were "at his direction," Sidhu was "given a lot of freedom."

¶ 44    As to MCC, in 2012 or 2013, Pundaleeka assigned his individual membership interest to PFH. As to the amended operating agreement, he offered that the term "economic interest" was the same as one's "percentage interest."

¶ 45    Pundaleeka and Dhiman signed an amendment to the operating agreement on November 28, 2017. Modi and Sidhu were not notified of the amendment and objected once they learned of it. A meeting was officially called after the amendment was signed, even though "it was okay to execute" without one.

¶ 46    In August 2017, prior to the amendment, Pundaleeka executed a purchase agreement to sell the Property to CHT for $6,643,895. The negotiations began in the first half of 2017. Pundaleeka was primarily responsible for negotiating the sale of the Property, and only communicated with Dhiman about its terms. The purchase agreement was amended on March 30, 2018, which reflected a reduction of the purchase price by about $100,000 dollars from $6.643 million. Pundaleeka testified that CHT wanted to close the deal by the end of March, otherwise "they would walk," and so the price had been reduced primarily due to the closing's delay due to the easement issue. Pundaleeka testified that he had to give the buyers "the terms they wanted" as the closing was originally supposed to be completed in September 2017. Instead, the Property closed on April 10, 2018, and Sidhu and Modi were notified of the closing via email on April 12, 2018.

¶ 47    CHT identified the easement issue in January 2018. Pundaleeka testified that he had located a "2003 letter" that talked about easements on the Property. Pundaleeka further testified that it would have been "unlike Sidhu" not to respond to the 2003 letter if he had received it at that time. He acknowledged that Sidhu had offered to help resolve the issues, but Pundaleeka declined his offer.

¶ 48    Finally on direct examination, Pundaleeka testified that he signed the purchase agreement as agent of PFH, and PFH received over $3 million from the sale, with the remaining distribution to the other members estimated to be about $406,000. Pundaleeka decided to withhold Sidhu's distribution, which was calculated by taking the gross proceeds of the sale and subtracting closing costs, repayment of the mortgage on the Property, Pundaleeka's non-compete bonus, and the $100,000 decrease from the original purchase price. Pundaleeka acknowledged that a partner's meeting was never held, but that he had discussed the issue with Dhiman who indicated that there was "no point in meeting" because Sidhu had cost them "so much money and aggravation."

¶ 49    As to his non-compete, Pundaleeka stated that the other members were not parties to it. There was no value assigned to the non-compete, but he indicated that the "buyers wanted him alone." Pundaleeka stated that the reason he was receiving "excess payment" in the sale was contained in the 2017 amendment.

¶ 50    On cross-examination, Pundaleeka testified that Dhiman "started the discussion" about paying Pundaleeka a bonus for any sale beyond $5.5 million, because Dhiman recognized how much work Pundaleeka had put in to get the deal done and "what [he] had to let go of." He stated that putting this deal together was "basically a full-time job" around the time he was preparing for retirement. Pundaleeka testified that each member would be paid after the mortgage was paid off, as was typical in every real estate deal.

¶ 51    Pundaleeka did not ask Sidhu to assist him in vacating the easements in 2018 because "he had lost trust in [Sidhu]" and that "[Sidhu] was not paying attention [to] a lot of other things." Pundaleeka indicated that Sidhu had been "mixing and matching money between entities" that neither Dhiman nor Pundaleeka had been aware of. Because the easement issue was complicated and urgent, Pundaleeka decided that Sidhu "was not the right person to get this done." Instead, Pundaleeka had Lori Russ, an employee of Future Diagnostics, address the easement issue.

¶ 52    On redirect examination, Pundaleeka admitted that there was no reference to the non-compete within the language of the 2017 amendment.

¶ 53                                iii. Dhiman

¶ 54    Dhiman was also called as an adverse witness. He testified that he was not involved in the acquisition of the Property in 2003 and became involved after MCC was formed. While Pundaleeka was considered managing member pursuant to the operating agreement and Sidhu had no formal management authority, "it was assumed" that Sidhu had authority over many of the other entities owned by the parties. Dhiman was aware that Pundaleeka transferred his individual percentage interest to PFH, and testified that Pundaleeka continued to be the "named manager" after the operating agreement was amended.

¶ 55    Dhiman testified that the other members were not notified of the 2017 amendment until after it was signed, but that a meeting was called to discuss it. Although the amendment said the Property was appraised at $5.5 million, Dhiman had not been privy to the appraisal because Pundaleeka had been primarily responsible for negotiating the sale. At the time he signed the amendment, he was aware of the non-compete but did not know its details. He agreed to sign the amendment because he had been experiencing financial troubles, and Pundaleeka had agreed to be

the sole signer on a bank loan for one of their other businesses. Therefore, he thought Pundaleeka was entitled to a bonus.

¶ 56    Dhiman further testified that a meeting was never held to discuss withholding of Sidhu's distribution. Dhiman believed that Sidhu's distribution should be withheld until all issues were resolved and he wanted Sidhu to "come clean" about various issues related to his overseeing of multiple businesses. Dhiman testified that there had been incidents where Sidhu had withheld information from him. He stated that he had a "large loss of faith and trust" in Sidhu's behavior. Dhiman stated that he learned about the easement issue while Pundaleeka was negotiating the sale of the Property, and that it should have been fixed a long time ago.

¶ 57    On cross-examination, Dhiman testified that Pundaleeka should have been paid "extra" for the sale of the Property because Pundaleeka had spent a tremendous amount of time, energy, and effort in correcting some of the Property's deficiencies to the satisfaction of the new purchasers. He also believed the non-compete meant that Pundaleeka could not develop some of his own properties, but that it did not immediately factor into his approval of the 2017 amendment. Dhiman stated that he trusted Pundaleeka completely, and that he was "not doing business with Sidhu anymore because he [had] let us down on numerous occasions."

¶ 58                                        iv. Modi

¶ 59    Modi testified that he had been a member of MCC since 2003, and was familiar with both the original and amended operating agreement. Modi testified that Pundaleeka had always been managing member, even after the operating agreement was amended. Modi received distributions from MCC between 2003 to 2015. However, after the sale of the Property, the distributions he received were not in accordance with his percentage interest.

¶ 60    Modi testified that he had not been involved in the sale, and that Pundaleeka had been responsible and did not ask Modi for assistance. Modi knew that Pundaleeka had commenced efforts to sell the Property in 2017, but was unaware of further details. He was also unaware of Pundaleeka's non-compete agreement.

¶ 61    Modi had not reviewed the 2017 amendment prior to it being signed, and did not agree with it because Pundaleeka would receive a disproportionate share from the distributions received from the sale. Modi further felt the amendment was improper because Pundaleeka did not seek permission from other members as to whether he should receive commission for his efforts to sell the Property. Modi believed that Pundaleeka needed unanimous consent to agree to the amendment pursuant to the amended operating agreement.

¶ 62    Modi learned about the sale after the closing statement had been emailed to the rest of the members by Pundaleeka. Modi did not agree with Pundaleeka's calculations because his own distribution and percentage interest had been reduced, as Pundaleeka had already taken his own incentive amount out from the total sale price. Modi did not consent to this calculation, and did not agree with Pundaleeka's withholding of Sidhu's distribution.

¶ 63    Upon cross-examination, Modi testified that he had been unaware of the non-compete, and that the instant litigation was the first time he had learned about it. However, knowledge about the non-compete would not have changed his opinion about Pundaleeka receiving a bonus.

¶ 64    Modi did not know about the details of Sidhu's daily work at MCC, or that Sidhu had been paid a management fee through Shravan. However, neither would have changed his opinion about whether Sidhu should receive his proper distribution interest. After he learned about the amendment, Modi did not participate in the telephone meeting. Modi was unaware about what had

been required to correct the easement issue at the time of sale, and he did not know why the sale had been delayed until Pundaleeka sent his email explaining the situation.

¶ 65    Following re-direct examination and some questions from the trial court, plaintiff rested.

¶ 66                                2. Defense Witnesses[7]

¶ 67                                    i. Jim Klockow

¶ 68    Klockow testified that he had been a licensed CPA since 1989, and performed tax return services for Dhiman, Pundaleeka, and Sidhu, as well as other members of the practice groups.

¶ 69    Klockow testified that between 2010 to 2018, Sidhu had been the administrator for all the related businesses and had decision-making power with regard to financial statement preparation. He would meet with Sidhu on a quarterly basis to review financial statements, which would then be presented to the other partners in the various entities. Klockow did not have any role in calculating distributions for any of Pundaleeka's businesses. Instead, his job was to make sure that any distributions from capital accounts were correctly issued, and he would then record them accordingly within the various requisite financial statements.

¶ 70    Klockow testified that he would utilize MCC's K-1 documents for accounting purposes, such as recording the various transactions in the financial statements to produce the numbers on the K-1 schedules. He testified that a K-1 reflects an individual's percentage interest in the business. When preparing the K-1s for MCC, he testified that Sidhu's percentage interest did not change from 5%, and that the most recent K-1 he had prepared for Sidhu was in 2019, which also reflected a 5% interest.

_____

[7] Although a great deal of testimony was also geared towards defendants' counterclaim against Sidhu for breach of fiduciary duty, judgment was entered against them, and defendants did not appeal. Thus, our recitation of the defense witness testimony has been streamlined to reflect only the relevant testimony related to Sidhu's complaint and the defendants' affirmative defenses.

¶ 71    On cross-examination, Klockow testified that Sidhu had not been involved in the sale of the Property and that he did not meet with Sidhu to review any financials. He reviewed the 2017 amendment and closing statement to prepare MCC's tax returns, which included proceeds from the sale. Klockow testified that the gross sales proceeds from the sale of MCC were not reflected on the taxes because the sale price is the gross sale price. Then, the price would be reduced by closing costs and other expenses. He testified that PFH had received $1,143,000 from the sale, and the original proceeds had been $2,073,000.

¶ 72    Following examination of an additional defense witness whose testimony largely concerned the process of vacating the remaining easements, the defense rested. Written closing statements were submitted to the trial court.

¶ 73                                H. Trial Court Ruling

¶ 74    On November 30, 2020, the trial court entered a written order. The court found in favor of Sidhu on counts I and V, and rejected Pundaleeka's counterclaim against Sidhu for breach of fiduciary duty. Pundaleeka appeals solely from the trial court's judgment on counts I and V in favor of Sidhu, and Sidhu appeals from the trial court's judgment as to count III in favor of Pundaleeka and Dhiman. Thus, we briefly detail below the court's ruling on those counts.

¶ 75    As to Count I, judgment was entered in favor of Sidhu against PFH, with damages in the amount of $181,188.96 plus pre-judgment interest. Judgment was denied generally as to Pundaleeka, individually, as the court found that he was not a party to the operating agreement and thus he could not be held personally liable for his conduct as an agent of PFH; and as to Dhiman, based on the affirmative defense of the business judgment rule.

¶ 76    First, the trial court found that the operating agreement was "unambiguous" in terms of how the agreement could be amended. The trial court found that Pundaleeka, on behalf of PFH,

was a managing member of MCC because he retained over a 50% interest and was thus allowed to direct, manage and control the entity.

¶ 77    Next, the trial court found that the sale of the Property was a *de facto* cessation of MCC because the entity had been solely created to manage and hold the Property. Thus, at minimum, pursuant to the Act, the sale constituted an "interim distribution" that had to be distributed in equal shares prior to the entity's dissolution and winding up.

¶ 78    The trial court concluded that, although "distribution interest" and "membership interest" could mean different things under the Act, the operating agreement governed in this case and as drafted, the two were synonymous. The trial court stated that under the agreement, "allocations of profits and losses" from MCC's operations were to be allocated in accordance with one's membership interest. The trial court concluded that the "membership share was the distribution share owed to the members, *but for the purported amendment*." (Emphasis added). The trial court also determined that any evidence of Sidhu's earnings beyond his membership was irrelevant to his interest in the entity, and could "not be offset against his membership interest" and that "salaries or other payments received" were not part of the profits owed to him. Thus, the trial court reasoned that the 2017 amendment was invalid because Sidhu's purported distribution fell beneath his 5% interest, and the evidence showed that the amendment was not unanimously approved. Accordingly, the trial court found that there had been a breach of the operating agreement.

¶ 79    As to count V, judgment was entered in favor of Sidhu against all defendants. Defendants were ordered to return any portion of Sidhu's 5% share from the sale of the proceeds that was still owed to him.

¶ 80    As to count III, Sidhu's breach of fiduciary duty claim, judgment was entered in favor of Pundaleeka and Dhiman. The trial court found that Pundaleeka's inclusion of a non-compete in

the purchase agreement, which resulted in him retaining a larger portion of the proceeds, did not constitute a breach of fiduciary duty. The trial court reasoned that MCC had received "market value for the Property" and that there had been no evidence at trial that it would have been entitled to any additional proceeds from the sale based on its appraisal of $5.5 million. Further, the trial court determined that the non-compete had not been adverse to MCC; rather, it had "made the deal more attractive to the purchasers."

¶ 81                                                    I. Motion to Reconsider

¶ 82    On December 1, 2020, defendants filed a motion to reconsider. The court denied the motion in its entirety but modified its ruling as to count V to reflect liability only against PFH, and no other defendant.

¶ 83    This appeal followed.

¶ 84                                                    II. ANALYSIS

¶ 85    On appeal, defendants contend that the trial court erred in its interpretation of the amended operating agreement. The issue before us is whether the 2017 amendment constituted either an amendment to the membership shares of MCC, thus requiring unanimous consent, or whether it was a general amendment, requiring approval of only 75% of the membership interest, and thus only Pundaleeka, on behalf of PFH, needed to approve the change.

¶ 86    We note additionally that Sidhu filed a cross-appeal regarding the trial court's denial of count III of his amended complaint for breach of fiduciary duty.[8] We will address Sidhu's cross-appeal following our resolution of defendants' appeal.

---

[8]    In their combined reply brief and response to the cross-appeal, defendants suggest Sidhu's cross-appeal is improper because he failed to file a proper docketing statement, an assertion strongly disputed by Sidhu. Our review of the record shows that on January 22, 2021, Sidhu filed a Notice of Cross-Appeal. Additionally, he filed a docketing statement on February 5, 2021. On April 19, 2021, this court entered an

¶ 87                         B. Standard of Review

¶ 88    Although the parties agree that the correct standard of review as to plaintiff's cross-appeal is manifest weight of the evidence, they disagree on the applicable standard of review as to defendants' appeal. Defendants contend that *de novo* review is appropriate because their appeal is limited to the trial court's interpretation of the amended operating agreement in conjunction with the 2017 amendment. Plaintiff disagrees and asserts that the correct standard is manifest weight of the evidence because an award of damages was entered after the conducting of a bench trial. Plaintiff also notes that the trial court made findings of fact as to four key points: (1) while a real estate deal was pending, Pundaleeka and Dhiman signed an amendment that granted PFH a larger distribution of proceeds from the sale; (2) the amendment was not approved by two members; (3) the sale of the Property was a *de facto* cessation of MCC; and (4) membership interest was equivalent to the distributional interest.

¶ 89    Typically, the standard of review in a bench trial is whether the judgment is against the manifest weight of the evidence, and a reviewing court will not substitute its judgment for that of the trial court unless "the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise, Ltd. USA*, 348 Ill. App. 3d 849, 859 (2008). The trial judge is the trier of fact and in the best position to assess the credibility of witnesses and determine the weight of their testimony. *Id.* An appellate court will not disturb the trial court's factual findings unless a contrary finding is clearly apparent. *Id.*

---

order allowing for four briefs to be filed, two for appellant and two for appellee. We see no impropriety and reject defendants' assertion.

¶ 90    We disagree with defendants that the standard of review is *de novo.* We acknowledge that parts of the trial court opinion present, at face value, questions of contract interpretation, which ordinarily would be reviewed *de novo* as a question of law. See *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129 (2005). For instance, in the judgment order, although located under the header titled "Factual Finding," the trial court made a legal finding that the operating agreement itself was "unambiguous" with regard to the management of the entity and amendment of any portion of the agreement.[9] Further, neither party contends on appeal that the agreement is ambiguous in any way.

¶ 91    However, we observe that an award of damages was entered by the trial court in favor of Sidhu. "When an award of damages is made after a bench trial, the standard of review is whether the trial court's judgment is against the manifest weight of the evidence." *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 133. Thus, in overturning a damage award, "a reviewing court must find that the trial judge either ignored the evidence or that its measure of damages was erroneous as a matter of law." *Id.*

¶ 92    The record demonstrates that the trial court's award-of damages to Sidhu was based on its ultimate conclusions that the sale of Property constituted a *de facto* cessation of the entity; that membership and distributional interests were functionally equivalent under these circumstances; that the 2017 amendment was invalid because it modified a membership interest without unanimous consent; and that Sidhu's salary earned as administrator could not offset any distribution he was owed in the sale. Although these issues inherently involve some interpretation

---

[9] In fact, the trial court already appeared to make this finding on its previous rulings on the parties' motions for summary judgment, albeit such a finding was derived from the trial court's analysis of whether the 2017 amendment was proper pursuant to the Act. As stated prior, the trial court found it was not.

of the operating agreement and the 2017 amendment, and perhaps could have been resolved at the summary judgment stage, we cannot ignore that the court took testimony on all of these issues and entered judgment on the evidence presented. Thus, we proceed under a manifest weight of the evidence standard, where we "give great deference to the [trial court's] credibility determinations" because it is in the "best position to evaluate the conduct and demeanor of the witnesses." *ICD Publications, Inc. v. Gittlitz*, 2014 IL App (1st) 133277, ¶ 52.

¶ 93    The same standard also applies to our review of the judgment entered on plaintiff's cross-appeal as to whether the defendants breached any fiduciary duty to Sidhu. Having determined the applicable standard of review for the entirety of the trial court's judgment, we proceed to our analysis.

¶ 94                C. Counts I and V: 2017 Amendment's Effect on the Operating Agreement

¶ 95    Defendants contend that the trial court's finding that the 2017 amendment required unanimous approval by the members is contrary to established principles of contract interpretation. They maintain that the amendment made no attempt to change either the voting percentages of the members or their distributed shares of profits and losses for any other transaction. As such, the amendment did not require unanimous approval of the membership.

¶ 96    Count I of the operative complaint alleged that the 2017 amendment violated the operating agreement. Count V is substantially similar in that it sought a declaration that the 2017 amendment was unenforceable, violated the operating agreement, and that Sidhu was entitled to a distribution in accordance with the operating agreement. As such, we address the two together.

¶ 97    The Act allows a limited liability company to enter into or amend an operating agreement to effectuate the company's administration and regulation of affairs, the conduct of its business, and the relationship between its members, managers and the company at large. 805 ILCS 180/15-

5(a) (West 2016). In the event that the "operating agreement does not otherwise provide, th[e] Act governs relations among the members, managers, and company." *Id.*; See also *In re Marriage of Schlichting*, 2014 IL App (2d) 140158, ¶ 63 ("Generally, an LLC operating agreement is to be enforced according to general contract principles, unless it conflicts with a statute.").

¶ 98   The trial court found that the operating agreement, rather than the Act, governed its interpretation of whether the purported distributions of the sale affected Sidhu's membership interest. We agree and now consider the relevant provisions in the operating agreement.

¶ 99   Before proceeding, we set out the governing principles regarding contract review. It is well-established that when "construing a contract, the primary objective is to give effect to the intention of the parties." *C.O.A.L., Inc. v. Dana Hotel, LLC*, 2017 IL App (1st) 161048, ¶ 58. Courts look first to the language of the contract to determine the parties' intent, and the language must be construed as a whole to give light to each drafted provision. *Id.* This is to ensure that the parties' intent is ascertained holistically, and not by "viewing a clause or provision in isolation, or in looking at detached portions of the contract." *Id.* (quoting *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011)). Further, if the words in the contract are clear and unambiguous, they will be given their plain, ordinary, and popular meaning. *Id.* A court will not interpret a contract in a manner that nullifies or renders a provision meaningless, as "when parties agree to and insert language into a contract, it is presumed that it was done purposefully[.]" *Id.*

¶ 100   Section 12.05 of the operating agreement makes clear that, if an amendment affects the percentage interest of a member, unanimous consent of the members is required. Conversely, if an amendment does not affect the percentage interest, only 75% of membership approval is required. PFH held 83.6% of the interest in MCC, and the 2017 amendment granted PFH disproportionate distribution from the sales proceeds of the Property, which had not been agreed to by Sidhu or

Modi. Thus, the question is whether the amendment effectively changed the percentage interest of the members.

¶ 101 The operating agreement defines a member's "Economic Interest" as "a "Member's *** share of one or more of the Company's *Net Profits,* Net Losses, and *distributions* of the Company's assets pursuant to [the] Operating Agreement." Sec. 1.01(i). (Emphasis added). The term "Economic Interest" is encompassed within another term, specifically "Member Interest," defined as a "Member's *entire* interest in the Company *including* such Member's *Economic Interest*[.]" (Emphasis added). Thus, a member's entire interest encompasses any share of MCC's net profits and distribution, a finding made by the trial court with which we agree.

¶ 102 It is true that the term "Percentage Interest" is defined separately within the operating agreement, specifically as "the percentage interest in the Company as set forth [in the agreement], as may be changed from time to time by the unanimous vote of the Members." However, Section 8.03, titled "Distributions" provides, in relevant part, that "[a]ll *distributions* of cash or other property shall be made to Members *pro rata* in proportion to the respective Percentage Interests of the Members on the record date of such distribution." (Emphasis added). Notably, at trial, Pundaleeka conceded that "percentage interest" was equivalent to "economic interest."

¶ 103 The trial court ultimately concluded that "distribution interest" was the same as "membership interest," which necessarily encompasses a member's "economic interest" and "percentage interest." Although somewhat convoluted, we agree with the trial court and emphasize that such terms were set forth and agreed to by the members in the execution of the operating agreement.

¶ 104 Having considered the relevant terms as defined in the operating agreement, we next consider whether the 2017 amendment affected Sidhu's membership interest. The evidence at trial

was that the proceeds of the sale would be distributed to the rest of the MCC members *after* PFH paid itself the extra profit derived from the sale, without any offsets. Put differently, as contemplated by the amendment, if the Property sold for $6.6 million after being appraised for $5.5 million, PFH was to pay itself $1.1 million *before* the profits of the sale were distributed to the rest of the members in accordance with their membership shares. Sidhu argues that by paying itself first, PFH effectively changed the amount of distribution he was to receive from the sale, about which neither he nor Modi agreed.

¶ 105   The trial court determined that the sale of the Property was a "*de facto* cessation of [MCC] since its sole purpose was for the management and holding of the [P]roperty." Regardless of whether the entity ceased to exist after the sale, the operating agreement considers any distribution or profit from the entity's operations as inherently tied to one's membership and percentage interests. It is undisputed that Sidhu was entitled to a share of the proceeds from the sale based on his 5% interest, and any decision to distribute the proceeds differently would affect a member's expected entitlement from that transaction. Because we read "distribution interest" as tied to one's "member interest" and "percentage interest," we agree that the 2017 amendment was effectively a recalculation of one's membership interest that required unanimous consent. The evidence shows that two members did not consent to this change, and thus the amendment's execution was in violation of the operating agreement.

¶ 106   Defendants further argue that section 12.05 of the operating agreement must be read in tandem with sections 8.01 and 8.02. According to defendants, these two provisions provide examples for what they deem "exceptions" to the general annual profit and loss distribution, which allow for changes to how profits and losses are distributed to members without affecting their membership interests. Thus, defendants characterize the 2017 amendment as simply a new and

permissible exception to regular distribution procedures, especially given the fact that the amendment specifically provides that it "should not be construed as any change of the Percentage Interest of ownership of any member."

¶ 107   Sidhu disagrees, contending that sections 8.01 and 8.02 are solely meant to address any potential losses to the capital accounts of the members, where, in accordance with certain tax regulations, a member's economic interest could potentially be diminished and create deficit capital accounts. Although we have found that economic interest can be synonymous with membership interest, we agree with plaintiff and do not find that these sections constitute exceptions to the distribution interests of the members, but rather are related to the management of the members' capital accounts.

¶ 108   Section 8.01 of the operating agreement, titled "Allocations of Profits and Losses from Operations," provides that the net profits and net losses for each fiscal year shall be allocated according to the member's percentage interests. Section 8.02, titled "Special Allocations to Capital Accounts," begins with the introductory phrase, "Notwithstanding Section 8.01 hereof" and then describes a variety of situations involving company losses and profits that may affect a member's capital account. See Sec 8.02(a) ("No allocations of loss, deduction, and/or expenditures described in Code Section 705(a)(2)(B) shall be charged to the capital account of any member if such allocation would cause *** a Deficit Capital Account); Sec. 8.02(b) ("In the event that any Member unexpectedly receives any *** distributions *** which would create or increase a Deficit Capital Account *** then items of Company income and gain *** shall be specially credited to the Capital Account of such Member ***). These provisions deal with extraordinary circumstances not applicable here, as they consistently contemplate instances of financial deviations from the

ordinary course of business with regard to the management of the members' capital accounts in order to avoid detrimental tax liability. See also Sec. 8.02(f); (h).

¶ 109 Accordingly, the trial court's determination that the 2017 amendment violated the operating agreement was not against the manifest weight of the evidence. There is no denying that the operating agreement at issue was drafted in a confusing and somewhat circular manner; however, this language is ultimately what the parties agreed to *twice*. We cannot say that the trial court ignored the evidence, or that its findings were unreasonable, arbitrary or not based on the evidence. As such, we affirm the trial court's judgment on counts I and V.

¶ 110                                    D. Count III: Breach of Fiduciary Duty

¶ 111 In the cross-appeal, Sidhu argues that the trial court erred in denying him judgment on his breach of fiduciary duty claim against PFH, Pundaleeka, and Dhiman. Specifically, Sidhu contends that the trial court erred in both failing to find that Pundaleeka, individually, breached his fiduciary duty to MCC, as well as failing to address whether PFH and Dhiman were also liable under the same theory.

¶ 112 "To recover for breach of a fiduciary duty, a plaintiff must prove that a fiduciary duty exists, that the fiduciary duty was breached, and that the breach proximately caused the injury of which the plaintiff complains." *Tully v. McLean*, 409 Ill. App. 3d 659, 681 (2011). A fiduciary relationship exists in a variety of capacities, either by friendship, agency, or business association, where "experience, trust and confidence are reposed by one party in another and the latter party gains an influence and superiority over the first as a result." *Id.* at 681-82 (citing *Maercker Point Villas Condominium Ass'n v. Szymski*, 275 Ill. App. 3d 481, 484 (1995)). In such relationships, there may be a duty against self-dealing. *800 South Wells Commercial LLC v. Cadden*, 2018 IL App (1st) 162882, ¶ 65.

¶ 113    When assessing fiduciary duties owed to limited liability companies, we turn first to the Act. *800 South Wells Commercial LLC*, 2018 IL App (1st) 162882, ¶ 31. Pursuant to the Act, a limited liability company is member-managed unless the operating agreement expressly designates otherwise. 805 ILCS 180/15-1(a)(1)(A)-(C) (West 2016). Section 5.03 of the operating agreement provides that the business and affairs of MCC were reserved to the members, but that any member holding more than 50% of the interest had the authority to "direct, manage, and control the company." The trial court found that Pundaleeka, holding more than 50% of the membership interest in MCC as agent of PFH, was managing member of the entity, and that Pundaleeka never delegated this duty to Sidhu. We find this determination consistent with the evidence at trial, as each member of MCC considered Pundaleeka to be the managing member.

¶ 114    Even assuming that Pundaleeka was not managing member, he was still a majority interest member who owed fiduciary duties to MCC, notwithstanding any duties defined at common law. See 805 ILCS 180/15-3(a). Under the Act, a member owes the "duty of loyalty and duty of care [pursuant to subsection (b) and (c) of the Act]." *Id.* A duty of loyalty includes, among others, accounting to the company and holding any property, profit, or benefit derived by the member in the conduct or winding up of the company's business or derived from a use by a member of the company's property, including the appropriation of a company's opportunity; and (2) acting fairly when a member deals with the company in the conduct or winding up of the company's business as or on behalf of a party having an interest adverse to the company. *Id.* 15-3(b)(1)-(2). The standard for assessing the duty of care is "grossly negligent or reckless conduct, intentional misconduct, or knowing violation of law." *Id.* 15-3(c). A member does not violate a duty to the other members "merely because the member's conduct furthers the member's own interest." *Id.* 15-3(e).

¶ 115   Turning back to the case at bar, count III of the amended complaint alleged that:

"PFH, by and through Pundaleeka, and Dhiman voted to amend the [o]perating agreement *** without calling *** or noticing a meeting[,] thereby excluding and interfering with the right of the minority members *** to participate in the management and control of the business and affairs of [MCC]"; "voted to amend the [o]perating agreement *** to change the Percentage Interests *** without unanimous consent of all members"; "distributed the proceeds of the sale of the Property in an [unauthorized] manner"; "distributed the proceeds of the sale *** over the objections of the minority members"; and "withheld Sidhu's distribution *** without contractual or legal justification."

¶ 116   Ultimately, the trial court entered judgment against Sidhu and in favor of Pundaleeka and Dhiman. Notably, the trial court did not make any explicit finding as to whether PFH was liable for breach of fiduciary duty. As count III was directed at each of the three named defendants, we address the claim as it relates to each one in turn.

¶ 117                                    1. Pundaleeka individually

¶ 118   Sidhu's first contention is that the trial court should have found that Pundaleeka, in his individual capacity, owed and breached a fiduciary duty to Sidhu. He argues that the trial court erred in determining that there was no evidence to support piercing the corporate veil to hold Pundaleeka personally liable, pointing to the fact that the evidence at trial was that: (a) Pundaleeka was at all times the managing member of MCC; (b) he owed fiduciary duties to MCC and its members; and (c) at all times he "personally exercised operational control of [MCC]."

¶ 119    We find helpful the trial court's discussion regarding breach of the operating agreement. In that regard, the trial court determined that there was no evidence to support liability against Pundaleeka individually. Specifically, the trial court stated:

"The evidence at trial was that Pundaleeka was acting on behalf of [PFH]. He was not individually a party to the Agreement. Corporate forms exist to shield their members from liability for corporate activities. [PFH] is a distinct and separate entity from Pundaleeka, and he cannot be held personally liable for his conduct as agent for [PFH] under the facts of this case. There are certain circumstances where the corporate form can be discarded, thus piercing the corporate veil, but no evidence was presented at trial to support such a finding. It has not been shown that [PFH] is the alter ego of Pundaleeka. Because there is no factual basis to impose liability on Pundaleeka, the court declines to do so. [Citations omitted]."

¶ 120    In contrast, the trial court's judgment as to the breach of fiduciary duty claim against Pundaleeka contains no similar discussion. Instead, the court's discussion focused on the non-compete agreement, which admittedly references Pundaleeka and PFH interchangeably:

"[N]egotiating this additional benefit for PFH cannot constitute a breach of the duty to [MCC] because [MCC] received the market value for the [P]roperty. There is no evidence that [MCC] would have received or been entitled to this premium, but for Pundaleeka's personal consideration to not compete. This was not adverse to *** [MCC]'s interest but simply made the deal more attractive to the purchasers.

Therefore, even though there can be liability under a strict interpretation of the Agreement entitling [Sidhu] to 5% of the collected amount paid to [MCC], the court finds that negotiating such a deal was not in breach of any duty. The amendment only allowed

Pundaleeka to recover for the amount that exceeded the appraised value of the land. No evidence of a diminished sales price was presented. *** Unfortunately or not, depending on which side one is on, Pundaleeka received those extra monies in the name of [MCC]. Therefore, [MCC] is entitled to the proceeds. However, the fact remains that the non-compete was not a business opportunity to [MCC], therefore Pundaleeka did not breach a fiduciary duty."

¶ 121   We first note that the plain language of the breach of fiduciary duty claim does not allege individual liability against Pundaleeka. It is true that a single sentence in the operative complaint alleges that "Pundaleeka acted in his individual capacity as a purported agent" of MCC and "disregard[ed] the formality of his purported agency relationship with PFH." However, the breach of fiduciary duty claim consistently alleges that Pundaleeka, *on behalf of PFH*, breached fiduciary duties to Sidhu and MCC. Further, the claim fails to allege that the "corporate veil" should be pierced to impose individual liability. See *Westmeyer v. Flynn,* 382 Ill. App. 3d 952, 953-954 (2008) (complaint alleged that plaintiff sought to pierce the corporate veil because members failed to observe corporate formalities, operated the entity as an alter ego, and sought to perpetuate fraud on its creditors). Thus, Sidhu's claim that Pundaleeka should have been held individually liable is improper as the four corners of his own complaint do not even allege such a claim. See *Stamp v. Touche Ross & Co.*, 263 Ill. App. 3d 1010, 1018 (1993) ("Although pleadings are to be liberally construed, a complaint which does not allege facts, the existence of which are necessary to enable a plaintiff to recover does not state a cause of action and such deficiency may not be cured by liberal construction or argument. [Citations and quotations omitted]."

¶ 122   Further, although not fully discussed by the trial court, Sidhu fails to provide any authority for the proposition that a corporate veil can be pierced with regard to a member of an Illinois-based

LLC. See *Westmeyer*, 382 Ill. App. 3d at 957-960 (noting that "[e]fforts to pierce the corporate veil are governed by the law of the state of incorporation."). Indeed, only in the reply brief does Sidhu attempt to bolster his claims with caselaw, but he cannot take solace in any as none stand for the proposition that in a limited liability context, a corporate veil for an Illinois-based LLC can be pierced. See *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491 (2005) (discussing piercing of the corporate veil with regard to non-shareholder of a corporation); see also *Buckley v. Abuzir*, 2014 IL App (1st) 130469 (discussing piercing of the corporate veil with regard to registered corporate agent of a corporation). We also observe that the Act appears to limit personal liability in an LLC "solely by reason of being or acting as member or manager" absent any express indication of the members' intent to do so, such as through the operating agreement. See 805 ILCS 180/10-10(a), (a-5), (d) (West 2016); see also *Puleo v. Topel*, 368 Ill. App. 3d 63, 67-69 (2006) (a member or manager of an LLC is not personally liable absent express indication by the LLC).

¶ 123   Again, the trial court determined that there was insufficient evidence to support a finding that PFH was the alter ego of Pundaleeka. Although we acknowledge that the evidence at trial showed a complicated web of business relationships, we are cognizant of the fact that the trial court is in the best position to assess the evidence and witnesses at trial. Here, the trial court determined that Sidhu had not met the heavy burden to show that the "corporate veil," if applicable at all, could be pierced. We affirm the trial court on this finding.

¶ 124                                    2. Dhiman

¶ 125   Sidhu argues that Dhiman's actions were a "textbook example of intentional self-dealing and minority-interest holder oppression." Although the trial court's judgment order does not expressly articulate its reasoning for finding in favor of Dhiman, we find that the record nevertheless supports the court's final judgment. There was no evidence adduced at trial as to

Dhiman's failure, as a minority-interest member of MCC, to exercise due care, nor was there evidence of bad faith, fraud, or illegality. Although it is true that that Dhiman admitted to not knowing all the details of the sale of the Property or Pundaleeka's non-compete agreement, it was his testimony that he believed Pundaleeka was entitled to the extra proceeds from the sale due to his work related to the Property's purchase, despite the fact that he ultimately would receive a lesser distribution. Further, it would be inconsistent to hold Dhiman liable for a breach of fiduciary duty, having previously found that he was not liable for violation of the operating agreement as both counts are premised on the same allegations. We again are mindful of the trial court's superior position in assessing the credibility of the witnesses before it, and as such, we do not disturb the trial court's finding that Sidhu failed to sustain his burden to hold Dhiman liable for breach of fiduciary duty.

¶ 126    We note merely in passing that in the court's judgment order regarding breach of the operating agreement, the court found applicable the business judgement rule as an affirmative defense barring Dhiman's liability for any breach of the operating agreement. The trial court stated:

"[T]he business judgment rule precludes second-guessing of a decision, unless the decision is a product of (1) a failure to exercise due care, or (2) bad faith, fraud, illegality, or (3) gross overreaching. A simple mistake in judgment is not subject to judicial review. The court must presume that Dhiman made his decisions on an informed basis, in good faith, and in an honest belief that the actions taken were in the best interest of the company. A simple mistake in judgment is not subject to judicial review. *** In order for [Sidhu] to overcome the presumption that Dhiman was exercising a good-faith business judgment in agreeing to this deal, [Sidhu had to] present evidence that Dhiman failed to inform himself,

- 34 -

prior to making the business decision, of all material information reasonably available to him, and that he otherwise acted dishonestly. [Citations omitted]."

¶ 127   Although the trial court found in favor of Dhiman, it did not address whether the affirmative defense also applied to the breach of fiduciary duty claim against him.[10] In any case, we affirm the court's judgment in finding that Dhiman was not liable for breach of fiduciary duty.

¶ 128                                                                3. PFH

¶ 129   Last, we address the breach of fiduciary duty claim as to PFH. As we have stated above, the trial court's discussion as to the non-compete interchangeably referenced PFH and Pundaleeka. However, neither in the narrative portion of the judgment regarding Sidhu's claim of breach, nor in the final order portion of the judgment does the trial court make any reference to PFH as to this claim. As such, we remand to the trial court for the limited purpose of making a finding on Sidhu's breach of fiduciary duty claim as it relates to PFH.

¶ 130                                              III. CONCLUSION

¶ 131   For the reasons stated, we affirm the judgment of the trial court as to counts I and V, and remand as to count III as to Pundaleeka Family Holdings.

¶ 132   Affirmed in part; remanded in part.

---

[10] We note that, when denying the parties' motions for summary judgment, the trial court previously found that the business judgment rule did not apply to any of the defendants. See Order on Motions for Summary Judgment ("The 'business judgment rule' has not been applied to LLCs in Illinois, and there is no statute that expressly incorporates any standard concerning 'business judgment'.").